795 So.2d 554 (2001)
Chester EDWARDS a/k/a Tailgunner Edwards a/k/a Tony Edwards a/k/a Chester R L Edwards a/k/a Chester R V Edwards a/k/a Leslie Edwards a/k/a Vaughn Chester Edwards, Appellant
v.
STATE of Mississippi, Appellee.
No. 1999-KA-01121-COA.
Court of Appeals of Mississippi.
June 19, 2001.
Certiorari Denied September 27, 2001.
*556 John M. Colette, Jackson, for Appellant.
Office of the Attorney General by Jean Smith Vaughan, for Appellee.
EN BANC.

MODIFIED OPINION ON MOTION FOR REHEARING.[1]
SOUTHWICK, P.J., for the court:
¶ 1. Chester Edwards was convicted of possession of methamphetamine with the intent to distribute while in possession of a firearm. On appeal, he asserts that the trial court erred in admitting evidence found on him and in his vehicle. Finding no reversible error, we affirm.

FACTS
¶ 2. While driving a tractor-trailer rig, Edwards made a mandatory stop at a state-operated weigh station east of Meridian on the interstate highway. His truck was found to be in compliance with the applicable weight limit. As Edwards drove the truck off of the scales, he was told to park and walk into the office. Two Mississippi Department of Transportation (MDOT) officers testified that on a random basis they had decided to do an additional "walk-around" inspection of the vehicle. Both officers testified that once Edwards was inside the station office, he appeared to be under the influence of narcotics. They surmised this from his agitation, his trembling hands and the fact that he repeatedly licked his lips, indicating a dry mouth. One of the officers testified that the fact that Edwards was wearing sunglasses on an overcast, possibly rainy morning added to his suspicion.
¶ 3. Before walking out with Edwards to inspect his truck, the officers asked him if he was carrying any weapons. Edwards stated that he was not. One of the officers noticed a bulge in Edwards's right-hand pants pocket. After brushing the bulge with his hand, that officer was of the opinion that it was a weapon. Edwards admitted that it was his pocket knife and that he had forgotten it. Edwards removed it from his pocket. The other officer then asked Edwards to empty all of his pockets. Edwards refused. At that time, a pat down for weapons was conducted. The officer performing the pat down felt a small round object that he thought was methamphetamine. After another officer *557 arrived to conduct a second pat down on Edwards, the object was removed from Edwards's pocket. It was a plastic bag containing what appeared to be methamphetamine.
¶ 4. At this time Edwards was arrested. The officers then sought Edwards's consent to search his truck. He refused to sign a consent form, but the officers testified that he gave them oral consent. Edwards informed them that he had a gun in the truck. In the process of stepping up on the running board to enter the truck, the officer retrieving the gun saw a marijuana joint in a cup on the console between the seats. Later, the officers along with a Bureau of Narcotics agent who had arrived, searched the truck. More drugs and drug paraphernalia were found. The substance found on Edwards and in some parts of the truck was methamphetamine. In addition, a field sobriety test was conducted on Edwards. The test indicated that Edwards was under the influence.
¶ 5. Edwards was indicted for possession of the drugs with intent to distribute. A suppression hearing was held. The trial judge in a written order concluded that the search of Edwards's person violated the Fourth Amendment. The court also found, though, that even if Edwards had not been searched, the walk around inspection of the truck still would have discovered the marijuana in a cup in "plain view" when an officer looked into the cab. He then would have been arrested for that offense as well as for being under the influence of drugs. This arrest would have led to the search of Edwards as an incident of arrest. Therefore the drugs inevitably would have been discovered.

DISCUSSION
¶ 6. Edwards argues that the random stop of his truck and the resulting searches violated the Fourth Amendment. We find the following facts to be critical to the outcome:
1) Edwards complied with his obligation to stop his commercial truck at this stationary weigh station established at one of the interstate highway entrances to Mississippi.
2) A weigh station officer randomly ordered a walk-around inspection of the truck. The specific acts that are involved with this inspection were to step onto the running board, to open the cab door in order to see the vehicle identification number and compare it to the "cab card," to check the safety of the tires, and to make certain of the condition of mud flaps and of load-restraining straps on flatbed trailers. There was also testimony that the procedure included going into the cab to seek weapons that were within an arm's reach of the driver's seat.
3) The trial court discussed various events within the weigh station office prior to the inspection, including a pat-down of Edwards for weapons, the discovery of methamphetamine, Edwards's failure of a field sobriety test, and his possible consenting to a search of the vehicle. The judge found that any problems with those events were cured by the discovery of a marijuana cigarette in the vehicle, which was in plain view to an officer conducting the inspection of the vehicle.
¶ 7. We now analyze each of these elements.

1. Right to require stop at weigh station
¶ 8. Requiring vehicles to stop at this weigh station is a seizure for purposes of the Fourth Amendment. Nonetheless, probable cause or even reasonable suspicion is not required in this situation. There are only "limited circumstances" in which suspicion is unnecessary. A fairly comprehensive *558 list of those situations appears in a recent opinion of the United States Supreme Court. City of Indianapolis v. Edmond, 531 U.S. 32, 36-40, 121 S.Ct. 447, 451-53, 148 L.Ed.2d 333 (2000).
¶ 9. Relevant here is that mandatory stops at highway roadblocks have been approved for certain purposes. Id. at 453. In an earlier opinion, the United States Supreme Court referred to weigh station stops of truckers as being distinguishable from the random stopping of all motorists in order to check their driver's licenses and automobile registrations. Delaware v. Prouse, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). The Court's prohibiting of random stops of motorists did not "cast doubt on the permissibility of roadside truck weigh-stations and inspection checkpoints, at which some vehicles may be subject to further detention for safety and regulatory inspection than are others." Id. at 663 n. 26, 99 S.Ct. at 1401 n. 26. Accord, Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 454, 110 S.Ct. 2481, 2487, 110 L.Ed.2d 412 (1990).
¶ 10. Three years before Prouse, the Supreme Court had found highway law enforcement officer's rights to stop, question and inspect to be more extensive at fixed checkpoints than for roving patrol stops as were involved in Prouse:
[The] objective intrusionthe stop itself, the questioning, and the visual inspection also existed in roving-patrol stops. But we view checkpoint stops in a different light because the subjective intrusionthe generating of concern or even fright on the part of lawful travelers is appreciably less in the case of a checkpoint stop.
United States v. Martinez-Fuerte, 428 U.S. 543, 558, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976).
¶ 11. In Prouse, the Court analyzed the issue of the Fourth Amendment reasonableness of stops to check for a license or registration "by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Prouse, 440 U.S. at 654, 99 S.Ct. at 1396. This balancing requirement originated in Camara v. Municipal Court, 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1967); 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 10.8(a) (3d ed.1996).
¶ 12. There are three requirements under Camara to validate a particular law enforcement practice involving a stop and limited detention: (1) existence of a strong public interest in maximizing success in combating the problem at hand; (2) an inability to achieve adequate result by relying on probable cause determinations; and (3) the "relatively limited invasion of the * * * citizen's privacy" involved in the procedure in question. Camara, 387 U.S. at 537, 87 S.Ct. at 1735. "Applying the previously discussed Camara standards, it would seem clear that the required stops at these stations for the purpose of weighing are reasonable under the Fourth Amendment." 4 LAFAVE, SEARCH AND SEIZURE § 10.8(c).
¶ 13. In Edmond, the Supreme Court referred to Camara as a case supporting administrative inspections. Edmond, 531 U.S. at 37, 121 S.Ct. at 452. Similar factors have been applied to temporary law enforcement stops of individuals. Brown v. Texas, 443 U.S. 47, 50-51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979) (seizures involve "a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty").
¶ 14. Requiring truckers to stop at this weigh station was valid.

*559 2. Random inspection

¶ 15. Once the seizure occurred, the evidence supported that the officers randomly selected Edwards's truck for an additional, "walk-around" inspection. There was at least a suggestion in Prouse that weigh station stops followed by additional inspections could be justified. As mentioned above, the Court did not intend to "cast doubt on the permissibility of roadside truck weigh-stations and inspection checkpoints, at which some vehicles may be subject to further detention for safety and regulatory inspection than are others." Prouse, 440 U.S. at 663 n. 26, 99 S.Ct. at 1401 n. 26.
¶ 16. We repeat the relevant facts in our case. The officers randomly chose Edwards for an additional obligation. It was to pull his truck to the side for a walk-around inspection. After Edwards did so, he walked into the inspection station. There he was questioned by two officers, Matthew Lott and Tex Jones. Lott told Edwards that he wanted to see his bill of lading, truck registration and his driver's license. Edwards returned to the truck to get it, acting angry and agitated according to Lott. After Lott reviewed the paperwork, he found it to be in order. Edwards was then informed that the officers would begin a walk-around inspection of the vehicle. That is when the vehicle identification number would be compared to the "cab card," the safety of the tires checked, and the existence and condition of mud flaps and load-restraining straps on flatbed trailers would be determined.
¶ 17. For the substantive answer to whether random selection for these inspections is proper, we return to the Camara factors that are referenced in Prouse. Prouse, 440 U.S. at 654, 99 S.Ct. at 1396.
¶ 18. First, there is a strong public interest in assuring that the large commercial vehicles are meeting minimal safety standards such as the condition of their tires, mud flaps, straps holding down loads, and other matters being inspected as described by the testimony at trial. Examining the driver's license and registration is something that Prouse itself authorizes when it occurs at a fixed site and to all vehicles of a specific category, as opposed to random stops by roving patrols of vehicles chosen at the officers' discretion. The Supreme Court did not question that at roadside truck weigh-stations and inspection checkpoints, "some vehicles may be subject to further detention for safety and regulatory inspection than are others." Prouse, 440 U.S. at 663 n. 26, 99 S.Ct. at 1401 n. 26.
¶ 19. Secondly, we find that if weigh station officials through their quick glance as a truck was being weighed must acquire probable cause to believe that there are defects in basic safety items such as tires, mud flaps, and other features, this would prevent acceptable results from being obtained. Delaying the vehicle and allowing a closer look is necessary. Moreover, if randomness is prohibited the manpower needs would be greatly increased, which might well lead to no inspections occurring except for probable cause arising from the quick glance.
¶ 20. Thirdly, we must decide whether requiring the driver to delay for the additional time necessary for a walk-around inspection is a "relatively limited invasion" of privacy. This is not a full vehicle search, with cargo being shifted or even removed, with the cab being closely examined, or any meaningful intrusion other than the inconvenience of the driver's having to wait somewhat longer at the weigh station. With one exception, what the officer saw were the same things any bystander would have seen whenever the vehicle was in a stationary position being refueled at a truck stop or paused at a rest stop. *560 The exception was the officer's stepping up on a running board and opening the door to see the vehicle inspection number. Considering the safety concerns that apply if a commercial truck is not what its driver purports it to be, suggesting theft or some other illegal conduct, we find this a relatively limited and necessary invasion.
¶ 21. Prouse identified a State's "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." Delaware v. Prouse, 440 U.S. at 658, 99 S.Ct. at 1398. Delaware's specific measure of stopping all kinds of motorists randomly was found not sufficiently to further those aims. "This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent. .... Camara v. Municipal Court, 387 U.S., at 532-533, 87 S.Ct. at 1733." Prouse, 440 U.S. at 661, 99 S.Ct. at 1400. Prouse then distinguished weigh station stops of commercial trucks and found that its holding was irrelevant to that analysis. Id. at 663 n. 26, 99 S.Ct. at 1401 n. 26.
¶ 22. For the very reasons that random stops were not justified in Prouse, we find them to be fully justified here once all commercial trucks have been required to undertake the initial stop to be weighed. We find that the health and safety concerns regarding large commercial vehicles are immense, individualized suspicions would not be effective, and the additional intrusion of the walk-around inspection is limited. See Camara, 387 U.S. at 537, 87 S.Ct. at 1735.
¶ 23. This was the analysis that upheld Kansas's random stopping of commercial trucks on the highway for safety inspections. United States v. Burch, 153 F.3d 1140, 1141 (10th Cir.1998) (state trooper randomly stopping commercial trucks for inspection). Random safety inspections of commercial motor vehicles have long been a recognized tool for highway safety:
We begin by accepting as substantial the Government's interests in promoting highway safety and protecting employees from retaliatory discharge. Roadway does not question the legislative determination that noncompliance with applicable state and federal safety regulations in the transportation industry is sufficiently widespread to warrant enactment of specific protective legislation encouraging employees to report violations. "Random inspections by Federal and State law enforcement officials in various parts of the country [had] uniformly found widespread violation of safety regulations," and [the relevant federal statute] was designed to assist in combating the "increasing number of deaths, injuries, and property damage due to commercial motor vehicle accidents." 128 Cong.Rec. 32509, 32510 (1982) (remarks of Sen. Danforth and summary of proposed statute).
Brock v. Roadway Exp., Inc., 481 U.S. 252, 262, 107 S.Ct. 1740, 1748, 95 L.Ed.2d 239 (1987) (bracketed inserts in original).
¶ 24. Even beyond commercial truck inspections, there have been situations in which random searches have been authorized when the reasons are not simply law enforcement. Of course, we are concerned with a seizure and not a full search, a distinction which under the balancing tests being applied in Camara and other case law is significant. As a useful analogy are the precedents that address "special need" searches. As the Supreme Court majority in Edmond stated, some "suspicionless searches" are permitted when the reasons *561 serve "special needs, beyond the normal need for law enforcement." Edmond, 531 U.S. at 37, 121 S.Ct. at 451, quoting Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 653, 115 S.Ct. 2386, 2391, 132 L.Ed.2d 564 (1995) (random drug testing of student-athletes permissible).
¶ 25. Among those special needs are several situations for random drug and alcohol testing for employees in safety-sensitive positions. Edmond, 121 S.Ct. at 451-52, 531 U.S. at 35-39 citing National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 627, 109 S.Ct. 1402, 1418, 103 L.Ed.2d 639 (1989)("the expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety.... [The importance of safety] was recognized by Congress when it enacted the Hours of Service Act in 1907," and also when it authorized the Secretary to "test ... railroad facilities, equipment, rolling stock, operations, or persons, as he deems necessary" under a 1970 railroad statute).
¶ 26. The critical considerations are under Camara or the similar factors in Brown v. Texas. Under those factors, we find that increased inspections of randomly selected truckers are permissible.
¶ 27. Relevant by analogy is case law for random administrative inspections of closely regulated businesses. See., e.g., New York v. Burger, 482 U.S. 691, 702-704, 107 S.Ct. 2636, 2643-44, 96 L.Ed.2d 601 (1987). Its primary application is to stationary business premises. Burger provides for notice to business premises owners "that inspections will be made on a regular basis and by limiting the inspection to regular business hours and to vehicles and parts subject to record-keeping requirements." CHARLES H. WHITEBREAD & CHRISTOPHER SLOBOGIN, CRIMINAL PROCEDURE, § 13.03(a) (1993) at 276. We find that the Burger test is satisfied here. Instead of the inspectors' choosing when to inspect, the trucker chooses by the schedule that he keeps. The inspection occurs at a stationary weigh site, can only occur when the trucker decides to use the adjacent highway, and is limited in scope to what can be seen from outside the vehicle. That a trucker is not always inspected is equivalent to the business that is not going to be inspected every day that it is open for business.
¶ 28. For the variety of reasons, starting with the Camara factors, then looking explicitly at the direction from the footnote in Prouse, and finally considering as analogies the special needs and the warrantless administrative inspection case law, we find no defect in the random selection of certain vehicles for a walk-around inspection once they have already been stopped for weighing.

3. Events in weigh station and inevitable discovery

A. Pat-down for weapons
¶ 29. The officer's pat-down of Edwards before the two officers went with him out to his tractor-trailer rig is when the first contraband was discovered. According to the trial judge's written findings, the officer's search of Edwards "was unreasonable as it does not fall within any recognized exception to the exclusionary rule found in the Fourth Amendment. Minnesota v. Dickerson, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)." The relevance of Dickerson is not explained, but the transcript reveals that the case was discussed at the suppression hearing. In Dickerson, the Supreme Court recognized a "plain feel" corollary to the "plain view" doctrine. When "a police officer lawfully pats down a suspect's outer clothing *562 and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified...." Id. at 375-376, 113 S.Ct. at 2137. However, the Supreme Court affirmed the lower court's decision that the specific officer conducting a pat-down on Dickerson did not obtain a plain enough feel to have probable cause to believe that the substance in his pocket was contraband. Id. at 379, 113 S.Ct. at 2139.
¶ 30. We interpret the quoted statement in the trial court's opinion, which immediately precedes the reference to Dickerson, to imply a finding of fact that the two officers who testified did not have probable cause to believe just from touch that the object in Edwards's pocket was methamphetamine. The officers may have been quite confident as to the identity of the substance, but the court rejected that they had a sufficient factual basis. Since the Dickerson "plain feel" exception for the discovery of contraband during a pat-down for weapons is the tactile equivalent of the "plain view" doctrine, it requires probable cause. Id. at 375, 113 S.Ct. at 2137; WHITEBREAD & SLOBOGIN, CRIMINAL PROCEDURE, § 10.03 (1993) at 212-213. Only reasonable suspicion is needed when a pat-down feels a possible weapon. Dickerson, 508 U.S. at 373, 113 S.Ct. at 2136.
¶ 31. Though only implied, this finding of fact was for the trial court to make. Therefore the "plain feel" exception factually cannot be used to justify what occurred to Edwards thereafter.

B. Field sobriety test
¶ 32. After finding the removal of the suspected drugs from Edwards's pocket to be invalid, the trial court also explained that a field test was conducted on the substance. It was found to be methamphetamine. After that result, Edwards was given and failed a field sobriety test. The court made no specific finding as to whether Edwards would have been given a field sobriety test absent the discovery and identification of the drugs. Nonetheless, there was significant testimony from the officers that Edwards's physical appearance and mannerisms alone created the basis to give the field sobriety test. Since the trial court found that the suspicions that Edwards was under the influence would have justified his arrest, we find it implied that the officers' suspicions were untainted by what the judge had just found was an improper discovery of drugs in Edwards's pocket.
¶ 33. The trial judge said that it was "clear to the Court that the Defendant was going to be arrested initially for Driving Under the Influence." Edwards argues that Department of Transportation officers may not conduct the test that then confirmed his impairment. The officers testified that they were not permitted to conduct an intoxilyzer test or take a blood or urine sample. The statute cited by Edwards that does not list MDOT officers applies to "a chemical test or tests of his breath, blood or urine...." Miss.Code Ann. § 63-11-5(1) (Rev.2000).
¶ 34. This is not the test administered on Edwards. What he received is called a "field sobriety test." The test basically measures coordination by requiring a suspect to attempt performing such tasks as walking a straight line or standing on one leg. The officer who gave the test stated that he had been trained in its administration. Department of Transportation officers at inspection and weight stations are authorized to arrest drivers who are found in violation of "laws with *563 reference to the fitness of a driver," among other laws. Miss.Code Ann. §§ 27-5-71 through 27-5-75 (Rev.1999). Thus these officers had the right to arrest Edwards for being impaired, which requires that they have a probable cause basis on which to do so. The field sobriety test indicated that he was under the influence of some substance and therefore impaired as a driver. Such tests may create probable cause to arrest for driving under the influence. Young v. City of Brookhaven, 693 So.2d 1355, 1361 (Miss.1997). There is no statutory prohibition on MDOT officers' performing the test and we find no other grounds on which to prohibit it.

C. Discovery of marijuana cigarette in cab of truck
¶ 35. The trial also found that the improbable "plain feel" discovery of drugs in Edwards's pocket was cured by the discovery in "plain view" of a marijuana cigarette between the front seats of Edwards's truck. We have already found that the officers had the authority randomly to subject vehicles to a more intrusive inspection. Edwards had been selected for that inspection. By standing on the running board at the driver's door, the officer testified he saw into the truck and discerned that a marijuana cigarette was in a tin cup. The trial judge specifically accepted that testimony.
¶ 36. We find no Fourth Amendment hindrance to a law enforcement officer's reasonable steps to look through a high vehicular window. This is akin to the enhanced view that police may properly gain by using binoculars or artificial lighting. Texas v. Brown, 460 U.S. 730, 740, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983) ("use of a searchlight is comparable to the use of a marine glass or a field glass"). That is the same view an officer could gain if the Department of Transportation had a platform constructed adjacent to where trucks parked on which officers could stand; such a platform would not violate Fourth Amendment rights. By "balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests," we find the enhanced view from the running board to be acceptably limited inspection technique. Prouse, 440 U.S. at 654, 99 S.Ct. at 1396; cf. Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 2043, 150 L.Ed.2d 94 (2001) (thermal imaging to measure heat emanating from home was a search).
¶ 37. Evidence found in plain view by officers who have a legal right to be in the position to view, if the object's incriminating character is immediately apparent, can be seized without a warrant. Horton v. California, 496 U.S. 128, 136-137, 110 S.Ct. 2301, 2307-08, 110 L.Ed.2d 112 (1990). An officer had the right to step on the running board. The officer testified that he saw and was able to identify the marijuana joint when he stepped onto the running board and looked through the window. The trial court accepted that testimony.
¶ 38. Once the marijuana in the truck was discovered, Edwards would have been arrested for that offense. Then a search of his person and an inventory search of his vehicle would have followed. This means that even if the pat-down discovery and seizure of the drug from Edwards's pocket was invalid, that same evidence would have been admissible under the doctrine of "inevitable discovery." Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). We find no defect in the evidence that supports the trial court's finding on inevitable discovery.
*564 ¶ 39. We review two remaining issues also raised by Edwards since they might impact the validity of the conviction.

4. Search of the truck
¶ 40. A search of the truck revealed an additional ninety grams of methamphetamine. One officer found a 33gram rock of methamphetamine inside a clear plastic bag in the outside compartment. Another sixty grams were inside a drink bottle covered in duct tape found inside the "headache rack" on the rear of the truck. On appeal, Edwards argues that the evidence from the truck is inadmissible as the search was illegal. Preliminarily, we note that there was testimony that Edwards gave his consent to the search, but Edwards at the suppression hearing denied that he consented. The judge never made a fact-finding, and we cannot on appeal resolve the factual dispute on consent.
¶ 41. We find no legitimate dispute that once Edwards was arrested because of the marijuana, standard procedure was for the truck to be subjected to an inventory search before it was driven or towed to a secure location. A wrecker service was contacted, which sends a driver or tow truck. An inventory search conducted pursuant to established procedures and policies does not offend the Fourth Amendment. Robinson v. State, 418 So.2d 749, 753 (Miss.1982). That policy here would have led to a search inside and outside the truck before it left the site.
¶ 42. With one exception all the evidence found would have been uncovered by a search conducted by these rules. The problematic item of evidence was a plastic bottle sealed with duct tape. Though there was some testimony that an officer could see all the way through the bottle, most of the evidence was that the contents were not discernible until the container was opened. The United States Supreme Court has permitted closed containers to be opened as part of an inventory search only if departmental regulations authorize it. "Our view that standardized criteria, or established routine, must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." Florida v. Wells, 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990) (citations omitted).
¶ 43. No copies of Department of Transportation rules were introduced below and only brief mention was made during testimony. In the Florida Supreme Court decision preceding the United States Supreme Court's opinion in Florida v. Wells, there was reference made to the state agency's submitting some rules with their amicus curiae brief. State v. Wells, 539 So.2d 464, 469 (Fla.1989). That court apparently was willing to consider evidence of state agency rules first introduced at the appellate level, though in that case no relevant rule existed. Id. The Mississippi Supreme Court has held that it will take judicial notice on appeal of a state agency's rules and regulations. North Mississippi Savings & Loan Ass'n v. Collins, 317 So.2d 913, 916 (Miss.1975) (Board of Savings & Loan Associations rules); Board of Education of Prentiss County v. Wilburn, 223 So.2d 665, 668 (Miss.1969) (Educational Finance Commission rules and regulations).
¶ 44. An initial search into readily available public documents, however, has not uncovered potentially applicable MDOT directives on opening closed containers during inventory searches. An officer testified generally about inventory search policy but was never asked specifically about this issue. We therefore find that the evidence as to what was in the *565 sealed bottle, which was 60 grams of methamphetamine, should not have been admitted under the inventory search exception. It is possible, but the trial judge made no findings regarding it, that discovering some of the other drugs during the inventory search created probable cause to open this container.
¶ 45. Notwithstanding this defect, evidence of a substantial quantity of drugs was presented. There were thirty-three grams of methamphetamine in a clear plastic bag in an outside compartment and six grams on Edwards himself. There was testimony that normal personal consumption of methamphetamine averaged from ½ gram to two grams. A presumption can arise from the quantity alone of an intent to sell drugs and not just use them personally. Fox v. State, 756 So.2d 753, 759 (Miss.2000). Even without the contraband found in the bottle, the officers recovered approximately thirty-nine grams of methamphetamine, at least twenty times the amount for personal use. In addition, there were scales found in the truck that were of the kind often used to weigh drugs. The evidence about the additional quantity was not a determining factor in the finding of intent to sell.

5. Authority to arrest
¶ 46. On rehearing, Edwards questions the arrest authority of these MDOT officers. The issue of arrest authority was mentioned in the motion to suppress, but there the argument was that officers of the Public Service Commission had no general police authority. It appears that counsel initially believed that these were PSC officers, but in fact none of these officers were with that agency. No factual presentation was made and no ruling from the trial court obtained as to arrest authority. Arrest authority was not questioned on appeal until the motion for rehearing and has not been briefed by both parties. The related argument that was made concerned the authority of these MDOT officers to conduct field sobriety tests. We have already addressed that issue.
¶ 47. A brief statement might be useful, though, to indicate that no plain error exists here. There were at least two bases on which to arrest Edwards before the inventory search was conducted. One was his being under the influence of drugs. We have discussed that issue previously in examining field sobriety tests. The other basis was the discovery of marijuana in plain view in the truck. Explicit authority to arrest for the drug offenses was granted to MDOT officers in one statute only after the events in this case. Miss.Code Ann. § 41-29-159 (Supp.2000) (authority effective March 18, 1999). However, the same statute that gives officers at inspection stations the authority to arrest an impaired driver also permits the officers "to enforce the provisions of all laws mentioned in Section 27-5-71, and in the performance of their duties such employees shall have the right to bear arms, and shall have the authority to make arrests...." Miss.Code Ann. § 27-5-75 (Rev.1999).[2] MDOT enforcement officers have long had the authority to search for contraband during an inspection, authority that appears in a statutory chapter entitled "Size, Weight and Load Regulations." Miss.Code Ann. §§ 63-5-1 & 63-5-49(3) (Rev.1996). That *566 authority is "mentioned" in Section 27-5-71 in two ways: MDOT officers may enforce "laws relating to the size and weight of vehicles" and "laws with reference to the inspection of any vehicle, driver or operator, or cargo" transported on state highways. Miss.Code Ann. § 27-5-71 (Rev.1999).
¶ 48. An MDOT officer may make arrests under Section 27-5-75 when criminal violations under these statutes are discovered during a proper inspection. Since we have found the walk-around inspection at this stationary weigh station site to be valid, the officers' discovery of drugs inside the truck properly could cause them to arrest Edwards.
¶ 49. THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT OF CONVICTION OF POSSESSION OF METHAMPHETAMINE WITH THE INTENT TO DISTRIBUTE WHILE IN POSSESSION OF A FIREARM AND SENTENCE OF FIFTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH NINE YEARS SUSPENDED AND FIVE YEARS OF SUPERVISED PROBATION AND FINE OF $5,000 IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING, P.J., PAYNE, BRIDGES, THOMAS, LEE, IRVING, MYERS and CHANDLER, JJ., concur.
NOTES
[1] The motion for rehearing is denied and this opinion is substituted for the initial opinion of the Court.
[2] The statute then states that these officers may "hold and impound any vehicle which is being operated in violation" of truck weight or privilege tax laws. Miss.Code Ann. § 27-5-75 (Rev.1999). We do not interpret the arrest authority to be limited to weight and tax laws, both as a matter of phrasing but also because of the statute's authorizing of enforcement of other laws.