The Honorable Gilbert Baker State Senator #17 Cooper Lane Conway, AR 72032
Dear Senator Baker:
I am writing in response to your request for my opinion on a question I will paraphrase as follows:
 Under A.C.A. § 26-56-228, an officer of this State, under the direction of the Director of the Department of Finance and Administration, is authorized to stop and search a motor vehicle to take fuel samples without a search warrant. Is such a procedure constitutionally permissible when weighed against the prohibition against unreasonable searches and seizures under Ark. Const. art. 2, §§ 15 and 29?
RESPONSE
In my opinion, it is permissible to conduct warrantless administrative inspections of vehicles and tanks located on public or commercial property. However, case law suggests that it would be impermissible to conduct such inspections without a warrant on private property. Although A.C.A. §§ 26-56-228(a)(1)(D) and — 228(a)(2)(C) might be read as impermissibly authorizing warrantless searches on private property, I understand that the authorities neither read nor apply the statute in this manner. Nevertheless, legislative clarification appears warranted. In my opinion, the statute at issue must further be read as precluding the Director of the Department of Finance and Administration or his designees from conducting warrantless inspections to investigate suspected criminal activity, as opposed to merely monitoring compliance with the tax laws.
Chapter 56 of title 26 of the Arkansas Code (Repl. 1997 Supp. 2001) comprises the Special Motor Fuels Tax Law (the "Act"). Subchapter 2 of the Act addresses the taxation of distillate special fuels — a category of fuels defined to "include products commonly referred to as diesel, kerosene, jet fuel, heating oil or fuel oil, cutter stock, and light cycle oil." A.C.A. § 26-56-102(9). Subsection 26-56-228(a) of the Code, which you reference in your request, affords the Director of the Arkansas Department of Finance and Administration the following powers:
(1) The director shall have the authority to:
(A) Stop motor vehicles;
 (B) Take samples of the fuel used or utilized for the operation of those motor vehicles;
 (C) Measure the amounts of fuel that could be contained in the supply tanks of such motor vehicles; and
(D) Test such fuel, regardless of the location of such motor vehicles.
(2) The director shall have the authority to:
 (A) Take samples of distillate special fuel stored in fuel storage tanks or fuel storage facilities outside of the terminal, which fuel may be used or utilized in motor vehicles;
 (B) Measure the amount of fuel that could be contained in such tanks or facilities, if filled to capacity; and
 (C) Test such fuel, regardless of the location of such tanks or facilities.
This grant of authority is in all respects consistent with the authority granted at A.C.A. § 26-56-216, which provides:
 (a) In order to enforce the provisions of this subchapter, the director or his authorized representative is empowered to stop any motor vehicle which appears to be operating with distillate special fuels for the purpose of examining the invoices and for such other investigative purposes reasonably necessary to determine whether the taxes imposed by this subchapter have been paid, or whether the vehicle is being operated in compliance with the provisions of this subchapter.
 (b) If, after examination or investigation, it is determined by the director or his authorized representative that the tax imposed by this subchapter has not been paid with respect to the fuels being used in the vehicle, the director or his representative shall immediately assess the tax due, together with the penalty hereinafter provided, to the owner of the vehicle, and give the owner written notice of the assessment by handing it to the driver of the vehicle.
 (c) The director or his representative is empowered to impound any vehicle found to be operating in violation of this chapter by a person other than one who has furnished the bond required of users by § 26-56-204 (c) until such time as any tax assessed as provided herein has been paid.
You have asked whether, in my opinion, these statutes offend Ark. Const. art. 2, § 15,[1] which provides:
 The right of the people of this State to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized.
This constitutional proscription against unreasonable searches and seizures tracks almost verbatim the federal proscription set forth at U.S. Const. amend. 4, and the Arkansas Supreme Court has in the past looked to pronouncements of the U.S. Supreme Court for guidance. See,e.g., Mullinax v. State, 327 Ark. 41, 47, 938 S.W.2d 801 (1997) ("Article 2, Section 15 of the Arkansas Constitution is virtually identical to theFourth Amendment to the United States Constitution. We thus interpret Article 2, Section 15 in the same manner as the United States Supreme Court interprets the Fourth Amendment."); Stout v. State, 320 Ark. 552,556, 898 S.W.2d 457 (1995) ("[W]e could hold that the Arkansas Constitution provides greater protection against unreasonable searches than does the Constitution of the United States, but we see no reason to do so. The wording of each document is comparable, and through the years, in construing this part of the Arkansas Constitution, we have followed the Supreme Court cases.").
However, in Griffin v. State, 347 Ark. 788, 67 S.W.3d 582, 584 (2002), the Supreme Court recently suggested that the state constitution might afford greater protection than its federal counterpart:
 We note that the provisions of Article 2, Section 15, of the Arkansas Constitution are similar to those contained in the Fourth Amendment to the United States Constitution, and it may be that the late-night intrusion upon appellant's property may have also violated the provisions of federal constitutional law. We have in many cases harmonized the protections afforded by Article 2, Section 15, of our state constitution with those provided by the Fourth Amendment to the United States Constitution. See Mullinax v. State, 327 Ark. 41, 938 S.W.2d 801 (1997); Stout v. State, 320 Ark. 552, 898 S.W.2d 457
(1995). However, we base our analysis of this case upon our own state law as expressed by our state constitution, statutes, and cases, recognizing that while we lack authority to extend the protections of the Fourth Amendment beyond the holdings of the United States Supreme Court, we do have the authority to impose greater restrictions on police activities in our state based upon our own state law than those the Supreme Court holds to be necessary based upon federal constitutional standards. See Arkansas v. Sullivan, 532 U.S. 769, 121 S.Ct. 1876, 149 L.Ed.2d 994 (2001).
Given that the court has not yet found occasion to discuss the scope of Ark. Const. art. 2, § 15 as applied to the facts set forth in your request, I am unable to opine whether any restrictions on the permissible scope of inspections would be greater under the state than the federal constitution.[2] In the absence of guidance on this issue, I can only address your request in terms of the Fourth Amendment standard discussed immediately below.
In my opinion, the Arkansas Supreme Court would in all likelihood follow the standard set forth in New York v. Burger, 482 U.S. 691 (1987), in which the U.S. Supreme Court defined the conditions under which authorities might conduct warrantless administrative searches of property belonging to "pervasively regulated" industries. The Court offered the following in distinguishing this standard from that applied to other types of searches:
 Because the owner or operator of commercial premises in a "closely regulated" industry has a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search, see O'Connor v. Ortega, 480 U.S. 709, 741, 107 S.Ct. 1492, ___, 94 L.Ed.2d 714 (1987) (dissenting opinion), have lessened application in this context. Rather, we conclude that, as in other situations of "special need," see New Jersey v. T.L.O., 469 U.S. 325, 353, 105 S.Ct. 733, 750, 83 L.Ed.2d 720 (1985) (opinion concurring in judgment), where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment.
 This warrantless inspection, however, even in the context of a pervasively regulated business, will be deemed to be reasonable only so long as three criteria are met. First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made. See Donovan v. Dewey, 452 U.S., at 602, 101 S.Ct., at 2540 ("substantial federal interest in improving the health and safety conditions in the Nation's underground and surface mines"); United States v. Biswell, 406 U.S., at 315, 92 S.Ct., at 1596
(regulation of firearms is "of central importance to federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders"); Colonnade Corp. v. United States, 397 U.S., at 75, 90 S.Ct., at 776 (federal interest "in protecting the revenue against various types of fraud").
 Second, the warrantless inspections must be "necessary to further [the] regulatory scheme." Donovan v. Dewey, 452 U.S., at 600, 101 S.Ct., at 2539. For example, in Dewey we recognized that forcing mine inspectors to obtain a warrant before every inspection might alert mine owners or operators to the impending inspection, thereby frustrating the purposes of the Mine Safety and Health Act — to detect and thus to deter safety and health violations. Id., at 603, 101 S.Ct., at 2540.
 Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." Ibid. In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. See Marshall v. Barlow's, Inc., 436 U.S., at 323, 98 S.Ct., at 1826; see also id., at 332, 98 S.Ct., at 1830 (STEVENS, J., dissenting). To perform this first function, the statute must be "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." Donovan v. Dewey, 452 U.S., at 600, 101 S.Ct., at 2539. In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be "carefully limited in time, place, and scope." United States v. Biswell, 406 U.S., at 315, 92 S.Ct., at 1596.[3]
482 U.S. at 702-03.
Although this passage specifically addresses the search of business premises, courts have interpreted it to apply equally to administrative inspections of vehicles owned by highly regulated businesses. See, e.g.,Edwards v. State, 795 So.2d 554, 561 (Miss.App. 2001) ("Burger provides for notice to business premises owners "that inspections will be made on a regular basis and by limiting the inspection to regular business hours and to vehicles and parts subject to record-keeping requirements." CHARLES H. WHITEBREAD CHRISTOPHER SLOBOGIN, CRIMINAL PROCEDURE, § 13.03(a) (1993) at 276."); McCauley, supra; Apollo Fuel Oil v. U.S.,195 F.3d 74 (2d Cir. 1999) (both undertaking Burger analysis in determining validity of commercial vehicle inspections).
Before applying these criteria to the Act, I should note my belief that the Act indeed imposes "pervasive regulation" of the sort that triggers the Burger analysis. Subchapter 2 of the Act, which deals exclusively with distillate special fuels, contains elaborate provisions for the imposition and computation of the privilege excise tax,[4] the licensing and bonding of suppliers and users, the computation and remittance of taxes, record-keeping and reporting of usage, administrative inspections to ensure compliance, sanctions for failure to comply with record-keeping requirements or for improper use of tax-exempt fuel, and the promulgation of additional necessary rules and regulations by the Director of the Department of Finance and Administration. The courts have regularly held that inspections pursuant to such a regulatory scheme of distillate special fuels are subject to analysis using theBurger criteria. See, e.g., Apollo Fuel Oil, supra at 77 (applyingBurger to reject a Fourth Amendment challenge to taking samples from a truck's propulsion tanks to determine whether the driver was impermissibly using dyed, nontaxable fuel). Moreover, at least four circuits have held that the commercial trucking industry in general is pervasively regulated and hence subject to the Burger standard for reviewing warrantless searches. United States v. Fort, 248 F.3d 475
(5th Cir. 2001); United States v. Burch, 153 F.3d 1140 (10th Cir. 1998); V-1 Oil Co. v. Means, 94 F.3d 1420 (10th Cir. 1996); UnitedStates v. V-1 Oil Co., 63 F.3d 909 (9th Cir. 1995); United States v.Dominguez-Prieto, 923 F.2d 464 (6th Cir.).
As noted above, the first question under the Burger analysis is whether "a `substantial' government interest . . . informs the regulatory scheme pursuant to which the inspection is made." 482 U.S. at 702. As the Court noted in its list of examples, "protecting the revenue against various types of fraud" clearly qualifies as a "substantial government interest."Id. Given that the obvious purpose of the Act's licensing, monitoring and inspection requirements is to prevent the commission of tax fraud against the state, I believe a "substantial government interest" in conducting inspections clearly exists.
In my opinion, warrantless inspections are also "necessary to further the regulatory scheme" at issue in your request, thus meeting the second prong of the Burger test. The McCauley court's analysis of another type of vehicle inspection is instructive with respect to this question:
 Although the issue of a warrantless stop of a commercial motor vehicle pursuant to Code § 52-8.4 is one of first impression in Virginia, other states have held that warrantless stops of commercial vehicles made pursuant to statutory provisions regarding the regulation of commercial vehicles do not necessarily violate the fourth amendment. See Drive Trans. Corp. v. New York City Taxi Limousine Comm'n, 134 Misc.2d 1035, 513 N.Y.S.2d 920 (N.Y.Super. 1987); People v. Escano, 843 P.2d 111 (Colo.Ct.App. 1992). In Drive Trans. Corp., the Court held that because the taxicab business is a highly regulated industry and because spot checks are essential to serve as a credible deterrent to violations, the random stopping of the taxicab did not violate the fourth amendment. We hold, that under these circumstances, Trooper Rogers' warrantless inspection of appellant's trash truck did not violate the fourth amendment because the regulation of commercial vehicles furthers an important government interest, warrantless inspection is necessary to further the regulatory scheme, the inspection program is known to all "motor carriers" pursuant to Code § 52-8.4 adopting of the Motor Carrier Safety Act, and the temporary checkpoint was reasonably limited in time, scope and duration.
435 S.E.2d at 894. I believe warrantless inspections are likewise necessary to serve as "a credible deterrent to violations" of the Act.
With respect to the third prong of the Burger test, I believe the Act clearly meets the requirement of advising the owner of commercial property that the property "will be subject to periodic inspections undertaken for specific purposes." Burger, 482 U.S. at 703. Sections26-56-216 and — 228(a) of the Code are perfectly unambiguous in declaring that vehicles and storage tanks falling within the ambit of the Act will be subject to random inspection in order to ensure compliance with the tax laws. These provisions clearly apprise the heavily regulated users and sellers of distillate special fuels that their vehicles and tanks will be subject to periodic inspection, although for obvious reasons the Act does not dictate precisely when those inspections will occur.
However, the Act might be broadly read as affording inspectors a degree of discretion that runs afoul of constitutional mandates. Specifically, A.C.A. § 26-56-228(a) purports to authorize testing of fuel contained in trucks or tanks" regardless of the location." As one Pennsylvania court noted in considering the issue of warrantless inspections of commercial trucks:
 [C]ases approving warrantless administrative inspections all concern inspections of commercial property. See, e.g., Colonnade Catering Corp. v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (inspections under historical close supervision of alcoholic beverage industry); United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (comprehensive and predictable inspection scheme under federal gun control legislation); Dewey (regular inspections of quarries under federal mine safety legislation permitted without warrants); Burger (routine inspection of records of vehicle dismantler pursuant to regulatory statute). The cases cited above uniformly recognize that absent consent or exigent circumstances, a private home may not be entered to conduct a search or to effect an arrest without a warrant. Dewey, 452 U.S. at 598 n. 6, 101 S.Ct. at 2538 n. 6, 69 L.Ed.2d at 268 n. 6 (citing Steagald v. United States, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981)). In addition, the curtilage area surrounding a private home where the occupants have a reasonable expectation of privacy that society is prepared to accept has been held to be protected by the Fourth Amendment. Commonwealth v. Lemanski, 365 Pa.Super. 332, 529 A.2d 1085 (1987) (citing Dow Chemical Co. v. United States, 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986)).
Commonwealth v. Waltz, 749 A.2d 1058, 1062 (Pa. 2000). In accordance with this principle, the court in Waltz held that Department of Revenue enforcement agents lacked the authority to conduct a warrantless search of a truck's fuel tank where the truck was parked in its owner's driveway. Id. at 1062-63. But see Lievesley, 985 F. Supp. at 211
("Treasury regulations provide that a designated inspection site is any `location' designated to be used as a fuel inspection site.26 C.F.R. § 48.4083-1(b)(2). Therefore a location on private property may be designated as a fuel inspection site.").
With respect to trucks operating on diesel fuel, A.C.A. § 26-56-216(a) might be read as curing any overbreadth in the language of A.C.A. §26-56-228(a) insofar as the former statute authorizes inspectors only "tostop any motor vehicle which appears to be operating with distillate special fuels" (emphasis added) — a provision that implies that inspections will occur only during the "working hours" of a truck's operation and, presumably, only on public or commercial property. SeeEdwards, supra, 795 So.2d at 561 ("Instead of the inspectors' choosing when to inspect, the trucker chooses by the schedule that he keeps.");compare Lievesley, 985 F. Supp. at 210-11 (applying Burger to approve warrantless inspection of truck fuel where state "limits inspections to daytime unless the vehicle is being operated at night"). Moreover, A.C.A. § 26-56-228(b) acknowledges that a tank owner retains the right to refuse permission to inspect, although doing so triggers a presumption that the tank is filled to capacity with taxable fuel. Officials of the Motor Fuel Tax Section of the Department of Finance and Administration inform me that as a matter of practice state inspectors never compel a tank or truck owner to submit to inspection and, absent consent, never encroach on non-commercial private property to conduct an inspection. Nevertheless, I believe it would be advisable for the legislature to clarify the scope of an inspector's powers under the Act.
Finally, as the court noted in Commonwealth v. Petroll, 738 A.2d 993,1003-04 (Pa. 1999):
 The closely regulated business exception to the probable cause and warrant requirements is not applicable in criminal cases. The police cannot conduct a warrantless administrative search to advance a criminal investigation under the pretext of addressing a specific, compelling governmental interest advanced by a statutory scheme.
I believe this principle qualifies the investigative discretion afforded the Director of the Department of Finance and Administration by A.C.A. §26-56-228(a).
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:JD/cyh
[1] You have also inquired whether these statutes might violate Ark. Const. art. 2, § 29, which provides that all laws contrary to the Arkansas Constitution are void. I will not independently address this challenge, since it appears to be purely derivative of the search-and-seizure challenge.
[2] The scope of Ark. Const. art 2, § 15 is currently at issue in two cases pending before the Arkansas Supreme Court: State v. Sullivan, Case No. CR99-1140, and Keenom v. State, Case No. CR01-673, both of which are scheduled for oral argument this month.
[3] This final criterion is on occasion identified as having two separate prongs. For instance, in McCauley v. Commonwealth,435 S.E.2d 891, 892 (Va.App. 1993), the court summarized the Burger criteria as follows:
 [W]arrantless inspections in the context of a regulated business are deemed reasonable so long as four criteria are met: the state has a substantial interest in regulating the industry; regulation of the industry must reasonably serve the state's interest and such warrantless administrative inspections must be necessary; the statute must inform a person operating in the industry that regular inspections will be made and set out the scope of the inspection notifying the person how to comply; and the "time, place and scope" must be limited and impose appropriate restraints on the inspectors' discretion.
[4] In Larey v. Continent Southern Lines, Inc., 243 Ark. 278, 284,419 S.W.2d 610 (1967), the Arkansas Supreme Court noted that the distillate special fuels tax might be better characterized as "reasonable compensation for the use of our highways."