Roderick Leshun RANKIN *v.* STATE of Arkansas

CR 99-97                                                    1 S.W.3d 14

Supreme Court of Arkansas
Opinion delivered October 7, 1999

724

*Cross, Kearney & McKissic,* by: *Gene E. McKissic,* for appellant.

*Mark Pryor,* Att'y Gen., by: *Michael C. Angel,* Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. Roderick Leshun Rankin, the appellant, was sentenced to death in 1996 for the capital murders of Zena Reynolds, her mother Ernestine Halford, and her stepfather Nathaniel Halford. In his first appeal, Mr. Rankin raised six points of appeal. We concluded that most of his assignments of error were meritless or procedurally barred from review. *Rankin v,. State,* 329 Ark. 379, 948 S.W.2d 397 (1997). However, we held that Mr. Rankin's argument concerning the admission of his incriminating custodial statements was well taken because the record contained no account of a hearing or ruling on Mr. Rankin's suppression motion. *Id.* We remanded the case, with instructions to the trial court to "conduct a hearing on the record for the limited purpose of determining whether Mr. Rankin's statements were made after knowingly and intelligently waiving his right against self incrimination." *Id.* As instructed, the trial court held the hearing on February 25, and March 2, 1998. Mr. Rankin's motion to suppress the incriminating statements was eventually denied by the trial court on October 6, 1998. That ruling is the subject of this second appeal by Mr. Rankin.

The facts surrounding this case are laid out in detail in *Rankin v. State, supra.* The murders occurred in the early morning hours of December 27, 1994. Based on the statement of Mr. Rankin's girlfriend, Sonyae Reynolds, who was hiding in a closet in the victims' home during the attack, Mr. Rankin became the prime suspect in the murders. At approximately 8:00 a.m. that same day, Pine Bluff police officers went to the house where Mr. Rankin lived with his mother, Mrs. Elaine Rankin. With the consent of Mrs. Rankin, they conducted a search of the premises until she withdrew her consent. Mr. Rankin was placed under arrest and

transported to the police station, where he was placed in a holding cell. At 10:43 a.m., Detective James Cooper read Mr. Rankin a form entitled "Rights Form" and verbally advised him of the *Miranda* rights contained in the form. Mr. Rankin responded verbally that he understood his rights and initialed each component of the form before signing his full name at the bottom of the form. Detective Arless Hudgins also witnessed the execution of the form. Mr. Rankin did not ask any questions about the form and appeared to be calm and quiet. Detective Cooper then began questioning Mr. Rankin about the murders. Throughout the morning hours, Mr. Rankin denied any involvement in the murders. At approximately 12:00 noon, the questioning was suspended for a lunch break, during which time Mr. Rankin was provided with a hamburger and a drink. After a break of approximately twenty minutes, Detective Cooper resumed the questioning. He accused Mr. Rankin of lying and asked him if he needed some time alone to think about the situation. Mr. Rankin indicated that he did want some time alone. Before Detective Cooper left the interrogation room, someone slid a note under the door stating that a gun, believed to be the murder weapon, had been found. Detective Cooper then left the room and conferred with Detective Terry Addison about showing the gun to Mr. Rankin. The two officers then entered the room and showed the gun to Mr. Rankin, who responded, "You don't have to show me that because I'm going to talk to you." At 1:21 p.m., Detective Cooper began recording Mr. Rankin's confession to the three murders. During the confession, Mr. Rankin was upset and crying. The tape recording of the confession ended at 1:27 p.m. He was then fingerprinted and photographed. At that time, he asked to see his mother and his request was granted.

Later that same day, around 4:15 p.m., Detective Cooper went to the Jefferson County jail to conduct a second interview with Mr. Rankin. Detective Cooper followed the same procedure he had used earlier in the day to advise Mr. Rankin of his *Miranda* rights. After Mr. Rankin signed a second Rights Form, Detective Cooper began recording another statement at 4:18 p.m. However, Mr. Rankin terminated the second interview at 4:22 p.m.

when he turned the tape recorder o' and stated that he no longer wished to talk to Detective Coope.

At the motion-to-suppress haring, Mr. Rankin argued that as a result of fatigue, youth, lack of education, mild retardation, and inability to understand the ature of the questioning, he did not make a knowing and intelgent waiver of his constitutional right against self-incrimination He also argued that he did not voluntarily give the recorded icriminating statements. The trial court found that the State had 'clearly met its burden of establishing both a knowing and inteigent waiver of rights as well as the voluntariness of [Mr. Ranin's] confession" and denied Mr. Rankin's motion to suppres. On appeal, Mr. Rankin asserts that his statements should hav been suppressed because they were involuntary and they were not the product of a knowing and intelligent waiver. We disagre.

## I. Voluntariness

For his firs point on appeal, Mr. Rankin alleges that he did not voluntarily make the incriminating statements to the police. When determining whether a statement is voluntary, the issue on appeal is whether the statement was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Britt v State*, 334 Ark. 142, 974 S.W.2d 436 (1998). In making this determination, we review the totality of the circumstances, and reverse the trial court only if its decision was clearly erroneous. *Id.* Relevant factors to this determination are the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; and the use of mental or physical punishment. *Id.* Two other pertinent factors are the statements made by the interrogating officers and the vulnerability of the defendant. *Conner v. State*, 334 Ark. 457, 978 S.W.2d 300 (1998).

Mr. Rankin alleges that the police told him during the interrogation that his brother and mother were going to be held at the police station until he gave an incriminating statement, and that such threats caused him to give the incriminating state-

ments. Both sides agree that Mr. Rankin's brother, Mr. Rodney Rankin, was being held at the station on the same morning Mr. Rankin was being interrogated.[1] Mr. Rankin's mother also was present at the police station on the same day. However, Detective Cooper testified that he did not know that the mother was in the station until after the confession had been obtained. Detective Cooper also testified that he did not know that Mr. Rankin's brother was at the station and being questioned by other officers at the same time he was interrogating Mr. Rankin. The credibility of witnesses who testify at a suppression hearing about the circumstances surrounding a defendant's in-custody confession is for the trial judge to determine, and we defer to the superior position of the trial judge in matters of credibility. *Wright v. State*, 335 Ark. 395, 983 S.W.2d 397 (1998). Even if Mr. Rankin's testimony were believed by the trial court, the police may use some psychological tactics and coercive statements in eliciting a custodial statement from the accused so long as the means employed are not calculated to procure an untrue statement, and the accused's free will is not completely overborne. *Conner v. State, supra.* We have previously held that an officer's threat to arrest the accused's wife, although obviously intended to influence the accused, did not render the statement involuntary. *Hood v. State*, 329 Ark. 21, 947 S.W.2d 328 (1997). In this case, Mr. Rankin decided to give his confession right after Detectives Cooper and Addison showed him the murder weapon. Under these circumstances, we are unable to say that Mr. Rankin's free will was completely overborne by any alleged threat to detain his mother and brother, or that such a threat procured an untrue statement.

Mr. Rankin also contends that his statements were rendered involuntary because he was held in custody for five hours without being advised of the nature of the charges against him and without being given the opportunity to make any phone calls before he gave his confession. In *Wright v. State, supra,* we determined that a custodial statement was voluntary when the total length of detention from the time of the arrest to the time of the

---

[1] Mr. Rodney Rankin also lived at his mother's house, and one of the victims, Zena Reynolds, was his girlfriend.

confession was less than six hours. Likewise, Mr. Rankin was held for less than six hours before he confessed. There is no evidence that Mr. Rankin was mistreated or physically or mentally punished during his detention. Nor is there any evidence that the police made any promises in return for his confession. Finally, Detective Cooper testified that Mr. Rankin was advised that he was a murder suspect. Detective Cooper also did not recall Mr. Rankin ever asking to make a phone call. As previously stated, we defer to the trial court in matters of credibility. *Wright v. State, supra.* Based on this record, we cannot say that the length or nature of Mr. Rankin's detention rendered his statements involuntary.

Mr. Rankin next calls our attention to his age, reading level, education, and intelligence. At the time of his confession, Mr. Rankin was nineteen years old. He had completed the eighth grade and read at a fourth-grade level. Dr. David Nanak, a psychological examiner, testified that he administered the Weschler Adult Intelligence Scale—Revised examination to Mr. Rankin in February 1995. This examination measures a person's IQ. Mr. Rankin scored a 66 on the full scale, with a verbal IQ of 69 and a performance IQ of 65. According to Dr. Nanak, Mr. Rankin's IQ score of 66 placed him in the range of "mild mental retardation." A second IQ test was administered in September 1995, which showed that Mr. Rankin had an IQ of 72. According to Dr. Nanak, this score put Mr. Rankin in the borderline classification range, which is not considered retarded. Dr. Nanak testified that the score of 72 was probably more accurate than the earlier score.

■ ■ This court has frequently stated that age and mental capacity are factors that we consider, but, standing alone, they are not sufficient to suppress a confession. *Britt v. State, supra* (finding that a confession by a seventeen-year-old defendant with an IQ in the borderline range was voluntary); *Misskelley v. State,* 323 Ark. 449, 915 S.W.2d 702 (1996) (finding that a defendant who was seventeen years old, possessed an IQ of 72, and read at the third-grade level voluntarily confessed). Additionally, the fact that the defendant is not a stranger to the criminal-justice system is a factor to be considered in determining whether a custodial statement was voluntarily made. *Wright v. State, supra.* There was evidence

presented at the suppression hearing that Mr. Rankin had previously been arrested on charges of theft and breaking and entering. Thus, he had some degree of familiarity with the criminal-justice system. Based on the totality of the circumstances, we cannot say that the trial court clearly erred when it found that Mr. Rankin's statements were voluntarily given.

## II. Knowing and Intelligent Waiver

■ For his second point on appeal, Mr. Rankin alleges that he did not knowingly or intelligently waive his *Miranda* rights. When determining whether Mr. Rankin knowingly and intelligently waived his *Miranda* rights, the relevant inquiry is whether he waived his rights with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Conner v. State, supra.* In order to make this determination, we review the totality of the circumstances surrounding the waiver, including the age, experience, education, background, and intelligence of the defendant. *Id.* We will reverse the trial court's ruling only if it was clearly erroneous. *Id.*

■ Mr. Rankin again points to the fact that he was only nineteen years old at the time he confessed to the murders, he read on a fourth-grade level, his formal education ended at the eighth grade, and he scored somewhere between 66 and 72 on IQ tests. We have held many times that a low intelligence quotient, in and of itself, does not mean that a suspect is incapable of waiving his rights. *Misskelley, supra*; *Oliver v. State*, 322 Ark. 8, 907 S.W.2d 706 (1995). *Oliver* is particularly on point. There, we held that a fifteen-year-old who was in the seventh grade at the time of the confession and had a second-grade reading level, an IQ as low as 74, and a mental age of a twelve-year-old, was capable of comprehending his *Miranda* rights and of waiving those rights. *Oliver, supra.* Also, in *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998), we held that a sixteen-year-old defendant who was mildly retarded and had an IQ of 67 was capable of waiving his rights. Moreover, both Dr. Nanak and Dr. John Anderson, a forensic psychologist at the State Hospital, testified at the suppression hearing that Mr. Rankin had the cognitive ability to understand the statements and questions on the Rights Form.

■ Mr. Rankin further alleges that the police officers never read him his *Miranda* rights and that he executed the Rights Form without reading it himself. It is undisputed that Mr. Rankin initialed each component of the form and signed his full name at the bottom of the form in the presence of Detectives Cooper and Hudgins. Detective Cooper testified that he read the Rights Form to Mr. Rankin before he began the interrogation and gave Mr. Rankin the opportunity to read the form himself. Detective Cooper also testified that Mr. Rankin indicated verbally that he understood his rights. That testimony was corroborated by Detective Hudgins. Once again, when there is conflicting evidence, the issue becomes one of credibility to be determined by the trial court. *Wright v. State, supra.* The trial judge is not required to believe the testimony of any witness, especially that of the accused since he or she is the person most interested in the outcome of the proceedings. *Id.*

■ Finally, Mr. Rankin asserts on appeal that he did not knowingly waive his *Miranda* rights because the rights forms he signed were inadequate in that the word "waiver" did not appear anywhere on the forms. The rights forms that Mr. Rankin signed contained each right required by the Supreme Court in *Miranda.* Following the statement of each right, the forms contained the question: "Do you understand?" In response to each question, Mr. Rankin circled the word "yes" and wrote his initials on the forms. He also signed his full name at the bottom of the forms. In *Weger v. State*, 315 Ark. 555. 869 S.W.2d 688 (1994), we held that a rights form containing each of the elements set out in *Miranda* fully advised the defendant of his rights. Also, in *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997), we held that a form with an express waiver provision is not a prerequisite to a finding of a knowing and intelligent waiver. The rights form is simply a factor to be considered as part of the totality of the circumstances in determining whether the waiver was knowing and intelligent. *Id.* During the second taped interview by Detective Cooper, Mr. Rankin reached over and shut the tape recorder off, stating that he no longer wished to talk to the police. This action by Mr. Rankin clearly indicated that he understood what his rights were, and he also knew how to invoke those rights.

█ Bed on the totality of the circumstances, we conclude that the trial court did not err when it held that Mr. Rankin knowingly and intelligently waived his rights.

### III. Arkansas Supreme Court Rule 4-3(h)

Pursuant to Ark. Sup. Ct. R. 4-3(h), the record was reviewed for all rulings adversely decided to Mr. Rankin but not argued on appeal, and no reversible errors were found.

Affirmed.