David GRIFFIN *v.* STATE of Arkansas

CR 00-1475 67 S.W.3d 582

Supreme Court of Arkansas
Opinion delivered February 28, 2002
[Petition for rehearing denied April 11, 2002.]

*Miler Law Firm*, by: *Leslie Borgognoni* and *Randel Miller*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Katherine Adams*, Ass't Att'y Gen., for appellee.

RAY THORNTON, Justice. Appellant, David Griffin, entered a conditional plea upon which he was convicted of drug-related offenses following the trial court's denial of his motion to suppress evidence obtained during a warrantless late-night search of his residence near Jonesboro. Griffin argues three points for reversal. We agree with his first argument that the covert nighttime intrusion upon his property by four police officers violated the provisions of Article 2, Section 15, of the Arkansas Constitution, and we reverse and remand with instructions to suppress the evidence obtained as a result of the unlawful intrusion upon his property.

## I. Principles of law

We note that the provisions of Article 2, Section 15, of the Arkansas Constitution are similar to those contained in the Fourth Amendment to the United States Constitution, and it may be that the late-night intrusion upon appellant's property may have also violated the provisions of federal constitutional law. We have in many cases harmonized the protections afforded by Article 2, Section 15, of our state constitution with those provided by the Fourth Amendment to the United States Constitution. *See Mullinax v. State*, 327 Ark. 41, 938 S.W.2d 801 (1997); *Stout v. State*, 320 Ark.

552, 898 S.W.2d 457 (1995). However, we base our analysis of this case upon our own state law as expressed by our state constitution, statutes, and cases, recognizing that while we lack authority to extend the protections of the Fourth Amendment beyond the holdings of the United States Supreme Court, we do have the authority to impose greater restrictions on police activities in our state based upon our own state law than those the Supreme Court holds to be necessary based upon federal constitutional standards. *See Arkansas v. Sullivan*, 532 U.S. 769 (2001).

In many states, the principle that a person should be protected against unreasonable searches and seizures of their persons, houses, papers, and effects was well-established before the 1786 Constitutional Convention adopted a similar restriction, the Fourth Amendment, forbidding the central government from issuing warrants without probable cause. Elisa Masterson White, *Criminal Procedure—Good Faith, Big Brother, and You: The United States Supreme Court's Latest Good Faith Exception to the Fourth Amendment Exclusionary Rule. Arizona v. Evans*, 115 S. Ct. 1185 (1995), 18 UALR L.J. 533 (1996) (citing Jacob W. Landynski, *Search and Seizure and the Supreme Court: A Study in Constitutional Interpretaion* 30-48 (1966)). The 1780 Massachusetts Declaration of Rights was the first to use the phrase "unreasonable searches and seizures." *Id.* (citing Nelson B. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 13 (1937)). The public furor over the issuance by the King of writs of assistance granting customs officials unlimited power of search and seizure had fueled the spirit of independence of the colonies. *Id.* (citing *Lasson, supra*).

The principle that a man's home is his castle, and that even the King is prohibited from unreasonably intruding upon that home, was particularly well-developed in the rough-and-ready culture of the frontier, and no less pronounced in the Arkansas Territory. In our 1836 Constitution, the people of our newly admitted state expressed this principle succinctly in the following language:

> § 9. That the people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and that general warrants, whereby any officer may be commanded to search suspected places without evidence of the fact committed, or to seize any person or persons not named whose offenses are not particularly described and supported by evidence, *are dangerous to liberty, and shall not be granted.*

*Id.* (emphasis added).

This principle is now articulated in Article 2, Section 15, of the present Arkansas Constitution, which provides that "the right of the people of this State to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated." *Id.*

■ ■ With reference to the protections contained in Arkansas's own state laws against unreasonable searches and seizures, the Supreme Court recently noted in *Arkansas v. Sullivan, supra:*

> We reiterated in *Hass* [*Oregon v. Hass,* 420 U.S. 714 (1975)] that while "a State is free as a matter of its own law to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards," it "may not impose such greater restrictions as a matter of federal constitutional law when this Court specifically refrains from imposing them."

*Arkansas v. Sullivan, supra* (citation omitted). In *State v. Sullivan,* 340 Ark. 315, 11 S.W.3d 526 (2000), we erred because we based our decision limiting police officers' discretion to intrude on individual liberty and privacy upon principles of federal constitutional law. *Arkansas v. Sullivan, supra.*

■ In the case *sub judice,* we apply Arkansas law, while observing that our decision does not impose lesser restrictions upon police activity than those guaranteed by the Fourth Amendment to the U.S. Constitution. It is also a principle of law in our state that the exclusionary rule commands that where evidence has been obtained in violation of search and seizure protections, the illegally obtained evidence cannot be used at the trial of the defendant. *See Yancey v. State,* 345 Ark. 103, 44 S.W.3d 315 (2001).

■ In Arkansas, there are rigorous standards to be followed in obtaining a search warrant, especially for a nighttime search. We note that nighttime searches with a warrant must be based upon exigent circumstances. Arkansas law allows for search warrants to be executed at night in three circumstances: (1) the place to be searched is difficult of speedy access; (2) the objects to be seized are in danger of imminent removal; or (3) the warrant can only be safely or successfully executed at night or under circumstances the occurrence of which is difficult to predict with accuracy. Ark. R. Crim. P. 13.2(c).

■ In *Butler v. State,* 309 Ark. 211, 829 S.W.2d 412 (1992), we cited with approval the following:

We find the United States Supreme Court case of *Welsh v. Wisconsin*, 466 U.S. 740, 104 S. Ct. 2091, 80 L. Ed.2d 732 (1984), to be instructive. In that case, the Supreme Court held that a warrantless, nighttime entry into a home to arrest an individual for driving while under the influence of an intoxicant was prohibited by the Fourth Amendment. The Court stated:

> It is axiomatic that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest. It is not surprising, therefore, that the Court has recognized, as "a basic principle of Fourth Amendment law," that searches and seizures inside a home without a warrant are presumptively unreasonable.

> Consistently with these long-recognized principles, the Court decided in *Payton v. New York*, 445 U.S. 573 [100 S. Ct. 1371, 63 L. Ed.2d 639 (1980)] (1980), that warrantless felony arrests in the home are prohibited by the Fourth Amendment, absent probable cause and exigent circumstances. . . . Prior decisions of this Court, however, have emphasized that exceptions to the warrant requirement are "few in number and carefully delineated," when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.

*Butler, supra.* We have also held that, in order to enter a residence or private dwelling without violation of prohibitions against unreasonable searches, both probable cause and exigent circumstances must be present. *Mitchell v. State*, 294 Ark. 264, 742 S.W.2d 895 (1988).

■ Under Ark. R. Crim. P. 11.1, an officer may conduct searches and make seizures without a search warrant or other color of authority if consent is given to the search and seizure. *Id.* The consent for a warrantless search of an individual's home must be given freely and voluntarily, and the burden rests upon the State to prove such consent by clear and positive evidence, and this burden is not met by showing only acquiescence to a claim of lawful authority. *Holmes v. State*, 347 Ark. 530, 65 S.W.3d 860 (2002).

■ As a general rule, where consent is freely and voluntarily given, the "knock and talk" procedure has been upheld as a consensual encounter and a valid means to request consent to search a house. *See United States v. Cormier*, 220 F.3d 1103, 1110-09 (9th Cir.2000); *United States v. Taylor*, 90 F.3d 903, 909 (4th Cir.1996); *United States v. Kim*, 27 F.3d 947, 951 (3d Cir.1994); *United States v. Tobin*, 923 F.2d 1506, 1511-12 (11th Cir.1991); *Cruz*, 838 F. Supp. at 543; *State v. Green*, 598 So. 2d 624, 626 (La. Ct. App.1992); *State v. Land*, 106 Or. App. 131, 806 P.2d 1156, 1157-59 (1991).

■ We believe that this "knock and talk" procedure has been well-defined in *Davis v. United States*, 327 F. 2d 301, 303 (9th Cir. 1964), where the Ninth Circuit Court of Appeals stated:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal *per se*, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof whether the questioner be a pollster, a salesman, or an officer of the law.

*Id.*

In some other jurisdictions, a police officer conducting a "knock and talk" must inform a person that he may refuse consent, revoke consent, or limit the scope of consent. *See State v. Ferrier*, 960 P.2d 927 (Wash. 1998). Other jurisdictions require a knowledgeable waiver. *See Graves v. State*, 708 So. 2d 858 (Miss. 1997).

## II. Facts

Informed by these principles of law, we consider the following factual circumstances. Griffin was an optician with his office on Highway 49 near Jonesboro. The offices are near the highway, and a two-story residence belonging to Griffin's parents is located a couple of hundred yards behind the office, accessible by a private drive. Griffin's parents own the house and occupy the main part of the house. Their residence is accessible through a front door. Griffin's residence is in the basement or lower floor, accessible by a sliding glass door. This apartment residence has a sitting room into which the sliding glass door opens, and two small bedrooms are adjacent to the sitting room. Separate from the residence and the

office are a shed and several other out buildings, which are some distance from the house and the office. Some two weeks before August 25, 1999, Griffin encountered Officer Bobbie Johnson walking across the property from the back fence toward the road during daylight hours. There is no indication that Griffin gave consent to this intrusion upon his property.

Officer Johnson testified that during daylight hours on August 25, 1999, he received an anonymous tip through another officer that Griffin was selling drugs from his office or home, and Johnson testified that the circumstances of the tip did not constitute probable cause upon which a search warrant could be issued.

Notwithstanding the lack of probable cause, Officer Johnson recruited Deputy Wes Baxter and auxillary deputies Bobby Phillips and Rod Abernathy, and the four officers went to the premises at about 10:10 p.m. that night. According to their testimony, it was pitch black, and they parked their vehicles fifteen to twenty yards from the house where they could not be seen from the sliding glass door that opened into Griffin's basement apartment. They made an inspection of one of the parked vehicles between the police cars and the house when they discovered the doors of the vehicle were open. No contraband was discovered in the vehicle. All four of the officers were carrying flashlights.

One of Griffin's guests, Karen Horton, testified that she was in the living room of Griffin's basement residence when she saw a bunch of flashlights out in the vicinity of the shed coming through the woods. She advised Griffin, who was in a back room on the telephone with his daughter, that four or five men were approaching the house. Horton testified that the officers told her not to move, and then ordered her to open the door. As she moved forward to open the door, Griffin emerged from the back room where he had been on the telephone with his daughter, and he stepped to the door to meet the officers.

Officer Johnson testified that the patrol cars were not visible from the house, that the officers looked in the parked car because it had an open door, and confirmed that the officers had walked around the premises before talking with Griffin. Johnson then stated he believed they first knocked, then walked around because nobody came to the door, and then returned to knock again, at which time Griffin answered the door. He then asserts, contrary to his earlier testimony, that the search did not begin until consent was given.

It is undisputed that no consent to search was signed, no advice was given that Griffin could refuse to consent to search, and no *Miranda* rights were read before the search began. It is disputed whether Griffin imposed limitations upon his consent to a search, or whether he later revoked his consent and demanded that the officers obtain a search warrant. The officers found a sealed container containing methamphetamine in a locked cabinet in Griffin's bedroom. They also discovered drug paraphernalia and a firearm.

## III. Standard of review

■ ■ In reviewing a ruling denying a defendant's motion to suppress, we make an independent determination based on the totality of the circumstances and view the evidence in the light most favorable to the State. We reverse only if the trial court's ruling is clearly against the preponderance of the evidence. *Burris v. State*, 330 Ark. 66, 954 S.W.2d 209 (1997); *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997). We defer to the trial court in assessing witness credibility. *E.g., Rankin v. State*, 338 Ark. 723, 1 S.W.3d 14 (1999); *Wright v. State*, 335 Ark. 395, 983 S.W.2d 397 (1998); *Tabor v. State*, 333 Ark. 429, 971 S.W.2d 227 (1998).

The trial court denied Griffin's motion to suppress evidence obtained by means of an illegal search and seizure, and accepted Griffin's conditional guilty plea and sentenced him to an aggregate of twenty-five years' imprisonment on the charges of possession of methamphetamine with intent to deliver and simultaneous possession of drugs and a firearm with an additional ten years suspended on the charge of possession of drug paraphernalia. Appellant does not raise an issue of insufficient evidence.

## IV. Analysis

For his first point on appeal, Griffin argues that the initial entry upon his premises constituted a prohibited search under Article 2, Section 15, of the Arkansas Constitution. He contends that the law enforcement officers made an unlawful intrusion onto his property late at night without a search warrant or probable cause to obtain a warrant. He argues that the search was not the result of a freely and voluntarily given consent to the search.

The State urges that the protections of Article 2, Section 15, of the Arkansas Constitution are not applicable because there was a consent to the search. The trial court's findings on this point relate in large part to an evaluation of Griffin's conduct after he answered his door, and began a conversation with the police officers seeking permission to come in and look for a methamphetamine lab. However, we must first address the threshold question of whether an illegal search had commenced before the police officers engaged Griffin in conversation at the sliding glass door.

Accordingly, we address the issue whether an illegal search had already begun before Griffin answered his door. The trial court's only finding relating to this threshold issue was that the officers did not violate Griffin's right to privacy by merely knocking on the door and requesting permission to enter his home. This finding might be appropriate to circumstances like those described in *Davis, supra*, where it is declared that there is no invasion of privacy "for anyone open and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof . . . [.]" *Id.*

However, those factual circumstances are not found in this case. The facts in this case bear little resemblance to those described in *Davis, supra*. With regard to whether the initial approach by officer Johnson was with an honest intent of asking questions, we note that Officer Johnson freely testified that the officers lacked probable cause to get a warrant, thereby giving rise to the warrantless "knock and talk" tactic. On cross-examination of Officer Johnson, the following colloquy occurred:

> Q: And you received this information from Officer Etter, Gary Etter?
>
> A: That's correct.
>
> Q: Now at that point, what information did you have besides Mister Etter's statement?
>
> A: None.
>
> Q: At that point, did you think you could stop and get a search warrant?
>
> A: No. But I've heard in the past where he was selling' drugs at his optical place down at Valley View.

Q: Well, based on that hearsay or rumor, could you have gone and got a search warrant.

A: No sir.

Q: Okay. In fact, did ya'll even discuss getting a search warrant?

A: No sir.

Q: Did you attempt in any way to find out the basis for Officer Etter's statement to you that day or the day before?

A: No sir.

Q: Did he offer you any explanation as to where that information came from?

A: No. People call in and tell us, and we go and check. And if they wanna let us in we do. Eighty percent of 'em let us come in and look.

Q: Eighty percent of them?

A: Well, I'd say fifty to eighty percent. I mean you ask 'em if you can come in and look, and they just say come in.

 Officer Johnson admitted on cross-examination that any attempt to obtain a search warrant would have been futile because no probable cause existed to support a search warrant. The only information that the officers had was a tip from a fellow officer, and Officer Johnson admits that this information was not enough to obtain a warrant. According to Officer Johnson's testimony, the officers received the tip earlier in the day, but decided to act on the tip at 10:10 in the evening. This evidence supports a conclusion that the nighttime approach was an effort to search Griffin's premises without a warrant and without probable cause.

With regard to the issue as to when the search actually began, the predominance of the evidence clearly shows that the four law enforcement officers approached the sliding-glass door of Griffin's basement residence through the woods from the vicinity of a shed, carrying flashlights so they could see in the pitch-black darkness. We do not consider that these actions conform to the *Davis, supra* test "for anyone openly and peaceably, at high noon, to walk up the steps and knock on the door of any man's castle. . . ." *Id.* Not only

did the actions of the officers not meet the standards related in *Davis, supra*, the predominance of the evidence clearly shows that an unlawful search had begun before Griffin was summoned to the door.

The officers employed stealth, parking their vehicles where they could not be seen from the entry of Griffin's residence. They then inspected a parked car because the door was open, and then, either before or after an initial knock, checked out a shed and walked around the premises. Whether the walk around of the shed was before or after an initial knock is of little consequence. We know of no authority for a "knock and *search*" doctrine holding that after knocking, it is permissible to begin a warrantless search before anyone comes to the door.

Based upon an independent determination of the totality of the circumstances under *Burris, supra*, we conclude that an illegal search prohibited by Article 2, Section 15, of the Arkansas Constitution had begun before Griffin was summoned to his door and asked for consent to search.

Accordingly, we must reverse and remand for the suppression of evidence obtained by the illegal search. Because this resolves the issue of suppression of the evidence, we need not address the other issues raised by appellant.

Reversed and remanded.

CORBIN, BROWN, and HANNAH JJ., concur.

IMBER, J., not participating.

DONALD L. CORBIN, Justice, concurring. I agree with the majority that the evidence in this case was obtained illegally because the officers began their warrantless search before they even attempted to obtain consent. I write separately to emphasize my concern about "knock and talk" searches in general. Before this type of consent search became so fashionable, the police were forced to investigate anonymous or unreliable tips before they could attempt to seize evidence. For example, in this case, the police would have had to attempt a controlled drug buy from Appellant, using the services of a confidential informant or an undercover police officer. With the advent of "knock and talk" procedures, however, the police are free to dispense with actual police work and "cut to the chase" of seizing evidence. In my opinion, "knock and

talk" procedures should be used only as an investigative tool, not as a complete substitute for investigation.

Furthermore, I agree with the majority that this type of warrantless intrusion into a person's home should only be permitted between the hours of 6:00 a.m. and 8:00 p.m., as provided in Ark. R. Crim. P. 13.2(c). If searches conducted pursuant to a warrant, based on a judge's finding of probable cause, cannot be served after 8:00 p.m. unless the judge makes one of three specific findings, then "knock and talk" searches, based on even less than reasonable suspicion, likewise should be limited. Otherwise, officers will attempt to use the darkness of the night to their advantage, as they did here. It troubles me that the officers in this case intentionally snuck up on Appellant after dark, parking their cars far enough away so that the occupants of the house would not see them.

Even more troubling is that the lead officer in this case, Officer Johnson, admitted that he made a conscious decision not to inform Appellant of his right to refuse consent. He explained that he was better off not offering any information because, on some occasions in the past, he has informed suspects of their right to refuse and they denied consent to search. In other words, Officer Johnson intentionally refrained from informing Appellant of his right to refuse because he was afraid that Appellant might actually invoke his right. On this issue, I agree with Justice BROWN that we should interpret the Arkansas Constitution as requiring that the right to refuse consent be explained before "knock and talk" searches will be upheld.

BROWN and HANNAH, JJ., join in this concurrence.

ROBERT L. BROWN, Justice, concurring. In recent years, the phenomenon of the "knock and talk" procedure has come into vogue as a substitute for obtaining either a nighttime or a daytime search warrant. Police officers simply accost a person at his or her home, because they do not have sufficient proof to establish probable cause for a search warrant. The police officers obtain a verbal consent to search the home from the homeowner and proceed with the search. The procedure has been upheld as passing muster under the Fourth Amendment to the U.S. Constitution, regardless of whether it takes place during the day or at night. *See, e.g., Rogers v. Pendleton*, 249 F.3d 279 (4th Cir. 2001); *United States v. Jones*, 239 F.3d 716 (5th Cir. 2001); *United States v. Johnson*, 170 F.3d 708 (7th Cir. 1999).

What is troublesome about the "knock and talk" procedure, particularly when it occurs at night which was the circumstance in the case before us, is the intimidation factor (usually two to four police officers are involved) and the message conveyed, either verbally or by insinuation, that if a consent is not given, the police officers will simply get a search warrant and come back. "Knock and talk" has become the subject of much debate, in part because it is unclear whether the consenting individual is ever fully aware that he or she can invoke constitutional protections and refuse to give consent. *See, e.g., United States v. Jerez*, 108 F.3d 684, 691 (7th Cir. 1997) (particularly discussing the inherent coerciveness of a knock-and-talk which occurs "in the middle of the night"); *Scott v. State*, 366 Md. 121, 782 A.2d 862 (2001); *State v. Ferrier*, 960 P.2d 927 (Wash. 1998).

The Washington Supreme Court has interpreted its state constitution to require that police officers must inform homeowners of their right to refuse a consent to search before a valid search may commence. *See State v. Ferrier, supra.* In that case, four police officers conducted a "knock and talk" on the appellant's home because they did not want to reveal the identity of their informant to a magistrate in order to get a search warrant. The appellant argued that the "knock and talk" at her home violated her right to privacy under the Washington Constitution. The Washington Supreme Court agreed and determined that the Washington Constitution provided greater protection than the U.S. Constitution with respect to the right to be free from unreasonable searches and seizures, *id.* at 111 (citing *State v. Gunwall*, 720 P.2d 808 (Wash. 1986)),[1] and held as follows:

---

[1] In *Gunwall*, the Washington Supreme Court developed six factors which govern whether or not it will extend greater protection under its constitution than the federal courts extend under the federal constitution. One of those factors is whether the wording of relevant state and federal constitutional provisions is similar.

While Arkansas's analog to the Fourth Amendment is worded similarly, that is not a barrier to our extending greater protections under the Arkansas Constitution. Other state courts have done so. *See, e.g., Virmani v. Presbyterian Health Serv. Corp.*, 350 N.C. 449, 515 S.E.2d 675 (1999) ("We have said that even where provisions of the state and federal Constitutions are identical, 'we have the authority to construe our own constitution differently from the construction by the United States Supreme Court of the Federal Constitution, as long as our citizens are thereby accorded no lesser rights than they are guaranteed by the parallel federal provision.' "); *People v. Belton*, 55 N.Y.2d 49, 447 N.Y.S.2d 873, 432 N.E.2d 745 (1982) (finding greater protection under state constitution despite similar wording of relevant federal and state search and seizure provision).

> [W]e conclude that the knock and talk, as carried out here, violated Ferrier's state constitutional right to privacy in her home and, thus, vitiated the consent she gave. This is so because she was not advised, prior to giving her consent to the search of her home, that she could refuse consent.

*Id.* at 115. In imposing the new requirement, the Washington Supreme Court did not distinguish between "knock and talk" searches conducted at day or night. *Id. See also Graves v. State,* 708 So. 2d 858, 862 (Miss. 1998) (interpreting the Mississippi state constitution to require a "knowledgeable waiver" of the right to refuse consent to search, which is defined as "consent where the defendant knows that he or she has a right to refuse, being cognizant of his or her rights in the premises").

No state, either by statute or court decision, currently requires that a homeowner sign a *written consent form* advising that homeowner of a right to refuse the search before the search can begin. Yet, such consent forms are being used by individual law enforcement agencies in Arkansas as came to light in a recent "knock and talk" case submitted to this Court for decision. *See Scott v. State,* S. Ct. No. CR2000-51 (submitted on review Jan. 10, 2002). I think using consent forms has merit. Requiring a homeowner to execute a consent form before the search begins would be tangible proof that a consent was given. The language of the form, in addition, would ensure that the individual is presented with the fact that consent can be refused. It would not eliminate all controversy surrounding a "knock and talk" consent, but it would remove some of the credibility battles between police officers and homeowners as well as other evidentiary quagmires that currently afflict our courts in this context, much as the *Miranda* waiver form has done for police interrogations.

A requirement for execution of a written consent form would be consistent with other actions this court has taken to guard against unreasonable searches and seizures under our state constitution. For example, this court has been in the vanguard of other jurisdictions in protecting a person and his or her "castle" against unreasonable searches and seizures at night. *See* Ark. R. Crim. P. 13.2(c) (setting out specific findings a magistrate must make for a nighttime search). We have strictly enforced this rule and made certain that police officers satisfy its criteria when presenting an affidavit for a nighttime search to a judge. *See Fouse v. State,* 337 Ark. 13, 989 S.W.2d 146 (1999); *Richardson v. State,* 314 Ark. 512, 863 S.W.2d 572 (1993); *Garner v. State,* 307 Ark. 353, 820 S.W.2d 446 (1991).

Though I agree with the majority that an invalid search began before the consent was given in this case, I offer the written consent form as additional protection against unreasonable daytime or nighttime searches.

CORBIN and HANNAH, JJ., join.

JIM HANNAH, Justice, concurring. I concur in the decision in this case, but would argue for greater restraints on police use of the "knock and talk." Article 2, section 15, of the Arkansas Constitution is a limitation on the power of government and provides protection against unlawful search and seizure. *Grimmett v. State*, 251 Ark. 270-A, 476 S.W.2d 217 (1972). In this case, we are dealing with the search of a home. On a number of occasions, this court has stated the old cliche that "a man's home is his castle." *Guzman v. State*, 283 Ark. 112, 672 S.W.2d 656 (1984); *Haynes v. State*, 269 Ark. 506, 602 S.W.2d 599 (1980). The protection of the home against unlawful intrusion is of paramount concern. This court has stated that a person's home should be free from intrusion by outsiders, including the government and its officers. *Haynes, supra*. In terms of the rights against search and seizure arising under the United States Constitution, the United States Supreme Court in earlier decisions confirmed the statement that illegal entry into a person's home is the chief evil guarded against by the Fourth Amendment. *United States v. United States District Court*, 407 U.S. 297 (1972); *McDonald v. United States*, 335 U.S. 451 (1948). It is also so presently under the Constitution of the State of Arkansas.

In the majority opinion, we now depart from our earlier decisions wherein this court has declared that the Arkansas Constitution provides no greater protection than the Fourth Amendment to the United States Constitution. *Rainey v. Hartness*, 339 Ark. 293, 5 S.W.3d 410 (1999); *Fultz v. State*, 333 Ark. 586, 972 S.W.2d 222 (1998). We previously noted that the wording of each document is comparable, and through the years, in construing this part of the Arkansas Constitution, we have followed the United States Supreme Court's cases. *Stout v. State*, 320 Ark. 552, 898 S.W.2d 457 (1995). Current interpretation of the United States Constitution in the federal courts no longer mirrors our interpretation of our own constitution.

In Arkansas, our constitution requires us to continue to lend greater protection in the area of warrantless searches. This is evident in the fact that a warrantless search is presumptively unreasonable.

*McFerrin v. State*, 344 Ark. 671, 42 S.W.3d 529 (2001). More particularly, in this case, we must deal with the issue of oral consent to search and police conduct known as a "knock and talk."

Here the State claims the right against unlawful search and seizure was waived during the course of the discussion arising from the "knock and talk." Certainly, the right may be waived. *Williams v. State*, 237 Ark. 569, 375 S.W.2d 375 (1965). However, in the situation where the police choose to go to a person's home to seek the opportunity to search, we must be very careful that the police do not abuse their position of power and authority. As noted, a man's home is still his castle, and of this, this court stated, "The right to this protection is too valuable to entrust to those who are charged with the duty of apprehending criminals and whose duties also require them to locate evidence to prove the guilt of suspects." *Guzman*, 283 Ark. *at* 117.

In *Guzman*, in expressing this concern, we cited to the United States Supreme Court in *McDonald v. United States*, 335 U.S. 451, 456 (1948), wherein that Court stated:

> Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that Constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.

The "knock and talk" practice of police poses a serious threat to the right of privacy and right against unlawful search and seizure. Our constitution requires that consent to search a home cannot be coerced, explicitly or implicitly, or by threats whether implied or overt. *Guzman, supra.* Where police go out with bare unsubstantiated allegations of illegal activity and try to gain access to residences and businesses by obtaining oral consent to search, the intent of the police is understandable and clear. The encumbrances placed on police by the requirements of obtaining a search warrant doubtless make the police less effective. However, this court has long held that consent to a warrantless search of one's home must be given freely and voluntarily. *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997); *Guzman v. State, supra.* The State has a heavy burden to prove by clear and positive testimony that consent was freely and voluntarily given. *Scroggins v. State*, 268 Ark. 261, 595 S.W.2d 219

(1980); *Humphrey, supra. See also Norris v. State,* 338 Ark. 397, 993 S.W.2d 918 (1999). The State failed to meet its burden in this case.

The facts of this case make clear the danger the police "knock and talk" poses. As the majority opinion notes, the federal courts compare police coming to the front door to salespersons or others who may lawfully approach a person's door. The validity of this comparison is highly questionable. While there is no doubt a police officer might approach one's door to sell tickets to the policeman's ball, or sell raffle tickets to a charity function in the same capacity as a salesperson might, in approaching the door to question an occupant about alleged illegal activities or the presence of contraband, the police officer's purpose is wholly inconsistent with that of a salesperson. In that case, he or she comes to the door clothed literally in the authority of the State, and likely in the eyes of the house's occupant, with the greatest power of the State that the average person may ever deal with face to face in his or her life. We ought also to note that the average salesperson generally does not come armed, although that might arguably increase sales.

The facts of this case simply will not support the idea that these police officers were just like the Avon lady or the child selling Girl Scout cookies. First, the average salesperson would likely avoid showing up at the door at 10:00 p.m. While bothering someone so late would likely result in lower sales of cookies, the police showing up so late would make a deeper impression and raise the level of pressure and intimidation. Second, a salesperson would not accuse a person of a felony. That, too, raises the level of anxiety and makes coercion more likely. Third, parking where their car could not be seen is not the likely tactic of the average salesperson who would not perceive taking the customer by surprise as a helpful sales technique. It would, however, have a tendency to catch the occupant of the house off guard and increase pressure to submit. Fourth, although the facts of the number of police officers at the door is in conflict, it is clear there were at least two initially and then four. Avon ladies generally do not travel in packs. Again, the intent is clear — to intimidate and make it more likely the person will give oral consent. Fifth, salespersons don't generally carry flashlights and check the yard and cars on the way to the door. Sixth, a salesperson would likely go to the front door, not a sliding glass door on the side of the house.

In short, there is nothing in these facts to support a claim that the police were on Griffin's property for a lawful purpose. It is difficult to imagine that given these facts a person would feel free to

decline the officer's request even under the Fourth Amendment analysis of the federal courts. *See Florida v. Bostick*, 501 U.S. 429 (1991). In fact, Officer's Johnson's testimony indicates he recognized that people he approached on "knock and talks" did not always feel they were free to ignore him.

The "knock and talk" practice is designed to gain entry for a search without obtaining a warrant, and in fact without any form of reasonable cause, or really even reasonable suspicion. It is designed to avoid the encumbrances of all the protections afforded by both the Arkansas and the United States Constitutions. From that perspective alone, the "knock and talk" should be viewed with disfavor.

The intent to avoid obtaining a warrant is apparent from the facts of this case and from the facts of other cases on this issue. The plan is simple. The police show up in force and intimidate the person into giving oral consent. Officer Johnson testified that he would conduct "knock and talks" until midnight, and it is apparent that late at night was the favored time. Absent a showing of exigent circumstances, Johnson could not have executed a search warrant at so late an hour. Ark. R. Crim. P. 13.2(c).

He also testified that using the method noted above, he got consent up to eighty percent of the time. Officer Johnson further testified that he had consent forms, but that he did not use them, and believed he was under no compulsion to advise a person they need not consent to the search. That statement in and of itself reveals acknowledgment that some persons may well have believed they had no choice but to submit to the search. The "knock and talk" raises significant issues, and unfortunately reinforces the concern that law enforcement should not be acting on their own.

The better approach would be to do the necessary police work to entitle the police to a search warrant. The preference in the law is for a warrant, and it is so strong that less persuasive evidence than would support a warrantless search will justify the issuance of a search warrant. *State v. Broadway*, 269 Ark. 215, 599 S.W.2d 721 (1980).

The police in this case were not faced with any exigent circumstances at all. There was no reason the police had to proceed on the night the police chose to act. The oral consent obtained under the facts of this case is simply not valid consent. Rather than struggle with oral consent in these cases, I believe the better

approach, which would be more consistent with our past cases on search and seizure, would be to require signed consent that advises the person of their rights. That would protect against the erosion of the right against unlawful search and seizure posed by the "knock and talk" method being increasingly used by police. The "knock and talk" search carries too high a danger of coerced consent. This has been recognized by other courts. In *State v. Ferrier*, 960 P.2d 927 (Wash. 1998), the Washington Supreme Court held that in a search arising from a "knock and talk,"police must inform the person that he may refuse consent, revoke consent, or limit the scope of consent. The Mississippi Supreme Court held that under a search resulting from a "knock and talk," there must be a knowledgeable waiver. *Graves v. State*, 708 So.2d 858 (Miss. 1997). These courts reached these conclusions based on their state constitutional provisions against unlawful search and seizure, and we should do the same under Article 2, section 15, of the Arkansas Constitution. These courts recognize the danger posed by the "knock and talk," and that danger is evident here in the high percentage of people who consent. Given the nature of the police conduct, there is a real danger that the persons consenting may believe themselves under restraint, and in consenting, are actually simply obeying the orders of the police they believe they must obey. There is a high likelihood they do not understand they have the right to refuse consent. Thus, I concur in the result in reversing this, but I would require that in the future, the police obtain written consent notifying the person of their rights and a knowledgeable waiver.

CORBIN and BROWN, JJ., join in this concurrence.