John Patrick DICKINSON *v.* STATE of Arkansas

CR 05-1264                                          238 S.W.3d 125

Supreme Court of Arkansas
Opinion delivered June 29, 2006

*McDaniel & Wells, P.A.*, by: *Bill Stanley*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Lauren Elizabeth Heil*, Ass't Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant John Patrick Dickinson appeals from his judgment of conviction for capital murder and attempted first-degree murder and his sentence to life imprisonment without parole plus twenty years, to be served concur-

rently. His sole point on appeal is that the circuit court erred in denying his motion to suppress a .40 caliber Glock pistol. We affirm the judgment.[1]

The facts are that in the early hours of May 13, 2004, police officers were dispatched to Rector, where one man, Jewel Cavaness, had been shot to death and another, Brad Hester, had been wounded. The motive, though it is somewhat sketchy, purportedly involved Cavaness's involvement with Dickinson's wife. Hester named Patrick Dickinson as the shooter. At the crime scene, Detective Glenn Leach of the Rector Police Department determined from the shell casings that were present that a .40 caliber Glock had been involved in the shooting.

Arkansas State Police Company Commander Rick Dickinson also responded to the call in Rector.[2] Chief Tommy Baker of the Rector Police Department informed him that the survivor, Hester, had named Patrick Dickinson as the shooter. Commander Dickinson recognized the name, because Patrick's father, Sandy Dickinson, and Commander Dickinson are cousins. Commander Dickinson inquired as to whether Patrick Dickinson's whereabouts were known, and Chief Baker responded that police officers had Patrick's house in Marmaduke surrounded and that he appeared to be home.

Commander Dickinson then drove to the home of his cousin, Sandy Dickinson, where they got in Sandy's truck and drove to Patrick's house. After knocking on the front door and receiving no answer, Commander Dickinson and Sandy Dickin-

---

[1] In its response to Dickinson's jurisdictional statement, the State urges that this court lacks jurisdiction to consider any claim of error regarding the circuit court's denial of Dickinson's motion to suppress, or any other adverse ruling against him, because his notice of appeal does not encompass the May 23, 2005, judgment. Instead, Dickinson's notice of appeal states that he appeals "the jury verdict entered against him on May 20, 2005, finding him guilty of Capital Murder and Attempted First Degree Murder, and further, appeals the sentence of the Circuit Court of Life Imprisonment and Twenty (20) Years Imprisonment, respectively." The State cites to this court's decision in *Hill v. State*, 363 Ark. 505, 215 S.W.3d 586 (2005). The *Hill* case, however, involved a conditional plea of guilty and Ark. R. Crim. P. 24.3(b)'s requirement to appeal the judgment and not the order denying suppression. Here, Dickinson did not enter a conditional plea of guilty. Instead, he was found guilty following a jury trial. Thus, Rule 24.3(b) and *Hill* are inapplicable. Because Dickinson's notice of appeal clearly appeals his convictions and sentence, we reject the State's jurisdictional argument.

[2] At the time, Rick Dickinson was the acting commander.

son walked around the house and retried the door. Patrick Dickinson answered the door, and Commander Dickinson informed him that "something had happened and that someone had said that he was involved and that there were some people that would like to talk to him." Commander Dickinson advised Patrick that he did not have to talk to anybody about anything, but Patrick had no problem in doing so. Commander Dickinson, Patrick, and Sandy drove in Sandy's truck to the Marmaduke Police Station.

Special Agent Phil Carter of the Arkansas State Police went to the station from the crime scene, and he went over the *Miranda* rights form with Dickinson and advised him of his rights. Dickinson signed the waiver-of-rights form around 2:00 a.m., the morning of May 13, 2004, following which Special Agent Carter conducted a taped interview with him. During the interview, Special Agent Carter asked Dickinson whether he would have any problem with the police looking at his .40 caliber Glock, to which Dickinson responded that would be fine, or okay. At the conclusion of the interview, Dickinson left the police station.

Later that morning, shortly after 4:00 a.m., Special Agent Carter went to Dickinson's home, with Detective Leach and Special Agent Bobby Stabbs of the Arkansas State Police. After knocking on Dickinson's front door, Dickinson answered and invited them in and the police officers stepped into the living room and told him and his wife, Stephanie, that they were there to interview her and to retrieve the weapon which Dickinson had told them they could have for testing. Dickinson went to his truck by himself, which was parked near his barn, to retrieve his Glock pistol. He did so and brought the pistol over to Special Agent Stabbs who was sitting in Special Agent Carter's vehicle. The special agent completed a receipt for property, which Dickinson initialed when he turned the gun over to Special Agent Stabbs.

Dickinson subsequently moved to suppress the pistol as evidence based on an illegal search, and the circuit court denied the motion.

Following a trial on charges of capital murder and attempted capital murder, Dickinson was convicted of capital murder and attempted first-degree murder and was sentenced to life imprisonment without parole plus twenty years, to be served concurrently.

Dickinson raises, as his sole issue on appeal, that at no time during the interview, nor at any point thereafter, did any law enforcement officer have him execute a consent to search form, nor did they advise him of his right to refuse consent. He also

emphasizes the fact that following his interview, he was released, and that it was at least two hours later when police officers returned to his home without a warrant to interview his wife and to retrieve the weapon. He contends that he merely acquiesced to the police officer's demand for the weapon and did not consent to a search of his premises or his vehicle.

He further submits that he was not advised of his right to refuse consent to any search of his premises as is required under *State v. Brown*, 356 Ark. 460, 156 S.W.3d 722 (2004). Acknowledging this court's holding that *Brown* was inapplicable to the search of a vehicle in *Welch v. State*, 364 Ark. 324, 219 S.W.3d 156 (2005), Dickinson avers that the search in the instant case was not a true search of an automobile, but, instead, was a search of a premises or curtilage, similar to the illegal search in *Griffin v. State*, 347 Ark. 788, 67 S.W.3d 582 (2002). As such, he contends that *Brown* is applicable and should be applied to the instant situation and that, accordingly, the Glock pistol should have been suppressed for failure to appropriately advise him of his rights. He maintains that the police officers' entry onto his land to obtain potential evidence was, by its very nature, a search, which was warrantless, not justified by any exigent circumstances, and occurred during the middle of the night.

In reviewing the denial of a motion to suppress evidence, this court conducts a *de novo* review based on the totality of the circumstances. *See Steinmetz v. State*, 366 Ark. 222, 234 S.W.3d 302 (2006). This court reverses only if the circuit court's ruling denying a motion to suppress is clearly against the preponderance of the evidence. *See Welch v. State, supra.*

Here, the circuit court concluded that there was no search of Dickinson's dwelling as defined by this court in its *per curiam* opinion of November 18, 2004, regarding Arkansas Rule of Criminal Procedure 11.1. In that *per curiam,* this court, following our decision in *State v. Brown, supra*, amended Rule 11.1 to provide in subsection (c) that "[a] search of a dwelling based on consent shall not be valid under this rule unless the person giving the consent was advised of the right to refuse consent." *In Re: Rules of Criminal Procedure, Rule 11.1*, 359 Ark. Appx. 565, 565 (2004) (*per curiam*). The order then defined "dwelling" as "a building or other structure where any person lives or which is customarily used for overnight accommodation of persons." *Id.*

The circuit court disagreed with Dickinson and found in its order denying suppression that the State had proven by clear and

positive evidence that Dickinson "freely and voluntarily relinquished possession of his .40 caliber Glock to Agent Bobby Stabbs" and that "[t]here was no actual or implied duress or coercion used by any law enforcement officer [Dickinson] came into contact with which caused [him] to relinquish possession of his gun to Agent Stabbs." The circuit court found that Dickinson "freely and voluntarily consented to placing his gun in the possession of the Arkansas State Police."

We agree with the circuit court's findings and conclusion. The term "search" has been defined by this court's rules as "any intrusion other than an arrest, by an officer under color of authority, upon an individual's person, property, or privacy, for the purpose of seizing individuals or things or obtaining information by inspection or surveillance[.]" Ark. R. Crim. P. 10.1(a) (2006). The commentary to Article IV, Rule 10 of the Rules of Criminal Procedure regarding search and seizure, reads that the key word in the definition of "search" is " 'intrusion,' a term sufficiently broad to encompass any legally cognizable interference with an individual's right to privacy." Commentary to Article IV, Ark. R. Crim. P. 10 (2006). Further, "the definition of 'search' is extended to cover any intrusions upon the privacy of an individual." *Id.* Likewise, "intrusion," while not defined by this court's rules, is defined by *Black's Law Dictionary* as "[a] person's entering without permission." *Black's Law Dictionary* 842 (8th ed. 2004). Here, a review of the totality of the circumstances in the instant case reveals that no such intrusion occurred.

During his interrogation by Special Agent Carter, Dickinson waived his *Miranda* rights and consented to the police officers' obtaining his gun on which to perform ballistic testing, as is revealed by the record which included the *Miranda* rights form and a transcript of the following colloquy:

> SPECIAL AGENT CARTER: Okay, and you said, you told me you did have a weapon?
>
> DICKINSON: I've got . . . yes . . . I've got a concealed carry permit. I do have a weapon.
>
> SPECIAL AGENT CARTER: Do you have a .40 caliber weapon?
>
> DICKINSON: I do have a .40 caliber.

SPECIAL AGENT CARTER: What kind is it?

DICKINSON: It's a Glock.

SPECIAL AGENT CARTER: Where's it at?

DICKINSON: It's . . . it's in the glove box of my truck.

SPECIAL AGENT CARTER: Would you have any problems with us looking at your weapon?

DICKINSON: No[.]

SPECIAL AGENT CARTER: Okay, so you would volunteer to let us have your weapon to look at it for a ballistics test?

DICKINSON: Sure.

Special Agent Carter testified to the same exchange at the suppression hearing. After reading Dickinson his *Miranda* rights and having him complete and sign the waiver form, Special Agent Carter conducted the interview with Dickinson at the Marmaduke Police Station. During that interview, Dickinson agreed to turn over the Glock pistol to police officers, without any coercion by the police:

PROSECUTOR: Did you ask him then would you had [sic] any problem with us looking at your weapon?

SPECIAL AGENT CARTER: I did ask him that.

PROSECUTOR: And did he respond that he didn't have any problem?

SPECIAL AGENT CARTER: Yes, it'd be fine or okay.

PROSECUTOR: Did you also asking [sic] him next — so you would volunteer to let us have your weapon to look at [it] for ballistics test. Did you ask him that?

SPECIAL AGENT CARTER: Yes, and he said sure.

PROSECUTOR: Okay. At that point had you advised him of his rights at that point?

SPECIAL AGENT CARTER: Yes.

PROSECUTOR: And are you doing anything — we can't tell by the transcript. Are you threatening him or are you striking him, any physical intimidation, any verbal intimidation, any gestures that would be intimidating to force him to do something such as volunteer turning over the weapon to you?

SPECIAL AGENT CARTER: No, he was very cooperative.

When police officers arrived at his home at 4:00 a.m. to question his wife and to obtain the gun to which he had given his consent, Dickinson posed no objection. Senior Special Agent Bobby Stabbs of the Arkansas State Police testified that he went with Special Agent Carter and Detective Leach to Dickinson's home. He testified as follows:

> Phil and Glenn knocked on the door and then some Stephanie [sic] came to the door. And I think Mr. Dickinson come to the door and they had told him that they would like to interview her and asked Rick — or asked not Rick but Patrick if we could have that gun that he had told him in a previous interview from what I understand that they'd let him have. And he said, yeah, he'd get it. And then I went with him. He went — I don't know if he had to get shoes on or something, but he went to his truck which was parked over by a barn. And I went back to Phil Carter's vehicle where I sat down in the car and I was filling out what's known as an ASP-2. It's a receipt for evidence or property. I started filling out that form and he brought me the weapon over to me.

■ Based on the total circumstances, we cannot say that an intrusion or search occurred. Dickinson clearly agreed to surrender his weapon to police officers at the Marmaduke Police Station so that they could conduct ballistics testing. He did so after being *Mirandized*. Moreover, after police arrived at his home, Dickinson himself went and retrieved the gun from his truck without any assistance or coercion by police. In short, no search occurred, which would have warranted advising Dickinson of his right to refuse consent. We affirm the circuit court's order denying suppression.

The record in this case has been reviewed pursuant to Supreme Court Rule 4-3(h) for reversible error, and none has been found.[3]

Affirmed.

---

[3] In conducting our 4-3(h) review, we discovered that the discussion regarding the instructions to be given to the jury was not recorded. We take this opportunity to underscore once more that Administrative Order Number 4, provides, that "[u]nless waived on the record by the parties, *it shall be the duty of any circuit court to require that a verbatim record be made of all proceedings pertaining to any contested matter before it.*" Administrative Order No. 4 (2006) (emphasis added).